**ICM MORTGAGE CORPORATION, Appellant,**

v.

**Phyllis JACOB, Appellee.**

No. 08–93–00295–CV.

Court of Appeals of Texas, El Paso.

Dec. 22, 1994.

Opinion Overruling Motion for Rehearing Feb. 16, 1995.

Aubrey D. Martin, Jr., Martin & Farley, L.L.P., Houston, for appellant.

Margaret S. Ingle, Ingle & Ingle, Stephanie McGuire, Houston, for appellee.

Before BARAJAS, C.J., and KOEHLER and McCOLLUM, JJ.

### OPINION

BARAJAS, Chief Justice.

This is an appeal from a $104,050 judgment for property damage and negligent and grossly negligent infliction of emotional distress in favor of Appellee. The jury found Appellants negligent and grossly negligent in obtaining and executing a forcible entry and detainer judgment against Appellee's leased residence after foreclosing on the property. The jury awarded Appellee actual damages (including damages for mental anguish) of $74,050, and punitive damages of $30,000. It declined, however, to find Appellant liable for the conversion of Appellee's personal property. We reverse the judgment of the trial court and render judgment in favor of Appellant.

### I. SUMMARY OF THE EVIDENCE

In November 1986, Michael and Cathy Arkus purchased property at 5310 Holly Bend Court, Houston, Harris County, Texas, and assumed liability under a note and deed of trust, both of which were held by Appellant. Appellee leased the premises from the Arkuses on December 1, 1986. In July of 1987, Appellant foreclosed its interest in the property under the deed of trust because the Arkuses had made no payments on the note. After the foreclosure sale, Appellant conducted an inspection of the property and learned the house was occupied but believed the occupants to be the Arkuses, having no knowledge of Appellee's lease. Appellant then commenced a forcible entry and detainer ac-

tion, the petition and citation for which were served on Appellee on August 18, 1987.

On the following day, Appellee contacted Mary Speidel, the attorney representing Appellant in the forcible entry and detainer action, and Appellee expressed her desire to continue living in the house and her interest in purchasing it. Speidel referred Appellee's questions to Appellant's Denver office, which handled all foreclosure and eviction proceedings in the Houston area.

The record demonstrates that Appellant frequently encountered tenants of foreclosure upon owners who expressed an interest in purchasing the property. Appellant's policy was to stay eviction proceedings only if a written contract was submitted in support of a tenant's offer.

Before contacting the Denver office and on her sister's advice, Appellee contacted Robert Zambie, the manager of Appellant's Houston office, to express her interest in purchasing the home and her willingness to pay rent on the property. Zambie advised Appellee to write a letter to Shirley Gassen in Appellant's Denver office and agreed to forward the letter to Gassen, which he did. The letter, dated August 19, 1987, reveals Appellee's status as the Arkuses' lessee as well as Appellee's wish to purchase the house and a request for information about how she could remain in it. Appellant did not reply to Appellee's letter before the justice court entered judgment for it in the forcible entry and detainer action on August 25th.

Disturbed at the lack of a response, Appellee herself mailed a second letter to Gassen sometime in September of 1987. The second letter reads in part: "Since I have not heard from you to date, I assume I am to continue residing [at the property].... [I]f there is rent to be paid (present rent $475.00 per mo.) please let me know as I would like to keep payments up to date." Appellant did not respond to this second letter.

Appellee continued to contact Zambie both before and after she sent the second letter. Zambie instructed Appellee to "sit tight until [she] heard from them" because Appellant needed to obtain clear title to the property before taking further action. Appellee several times contacted Zambie specifically to offer to pay rent and each time received the same response: Appellant could not even accept rent from Appellee until it had clear title to the property.

Sometime in September of 1987, Zambie instructed Appellee to contact Dave Roman, another person in Appellant's Denver office, which she promptly did. Roman, in turn, instructed Appellee to contact Judy Anderson, the Houston real estate agent likely to handle the property for Appellant. Appellee promptly contacted Anderson to express her interest in purchasing the house. Anderson did not, however, enter into sale negotiations because she had not yet been awarded the contract to list the house. Anderson explained this to Appellee, who then enlisted the aid of her own real estate agent, Marie Nugent. Nugent, too, contacted Anderson and received the same response: sale negotiations would be premature because Anderson had not been awarded the listing.

On November 6, 1987, some 73 days after Appellant received a favorable judgment in its forcible entry and detainer action, Appellant obtained a writ of possession from the justice court. On November 12, 1987, a Harris County Constable posted a notice of the writ of possession on the door to the residence. Appellee testified at trial that she received no notice, which testimony was not controverted.

On November 19, 1987, Appellee returned from work in the evening to find that the locks on the doors to her home had been changed. She could see that her house was empty and found on the front door a notice from a moving company that her possessions were stored at their facility. There was evidence that Appellee suffered emotional distress as a result of this occurrence.

Appellant's Denver office employee, Shirley Gassen, first heard of Appellee on November 24, 1987, when she received from an unknown source a fax transmission of Appellee's August 19, letter in which Appellee made known her interest in purchasing the house. Appellant thereafter paid $1,634 in moving and storage fees on behalf of Appellee in an effort to avoid litigation. Gassen

testified at trial that in all of her experience with Appellant, Appellee's is the only case in which Appellant agreed to pay storage and moving expenses incurred in connection with an eviction.

On December 1, 1987, Appellant for the first time informed Appellee that she should make an offer to purchase the property, and indicated its willingness to entertain a verbal offer.

## II. *DISCUSSION*

Appellant attacks the trial court's judgment in ten points of error. In Point of Error No. One, Appellant argues that the trial court erred in entering judgment for Appellee because she was a tenant at sufferance to whom Appellant owed no legal duty at the time of the eviction. Appellee makes no argument that Appellant owed her legal duties because of her status as a tenant at sufferance, claiming, rather, that Appellant owed legal duties to her because of her status as a tenant at will. The initial issue to be resolved then is whether Appellee was a tenant at sufferance after foreclosure or a tenant at will with greater rights against Appellant.

■ One in lawful possession of premises by permission of the owner or landlord and for no fixed term is a tenant at will. *Robb v. San Antonio St. Ry.*, 82 Tex. 392, 18 S.W. 707, 708 (1891). A tenant at will has no certain nor sure estate; the lessor may put him out at any time. BLACK'S LAW DICTIONARY 1466 (6th ed. 1990). A tenant at will, in contrast to a tenant at sufferance, possesses the property with the owner's consent. *Emerson v. Emerson*, 35 S.W. 425, 426 (Tex.Civ. App.—San Antonio 1896, no writ).

■ A tenancy at sufferance is a lesser possessory estate. A tenant at sufferance is merely an occupant in naked possession of property. *Goggins v. Leo*, 849 S.W.2d 373 (Tex.App.—Houston [14th Dist.] 1993, no writ). A tenant at sufferance is one who wrongfully continues in possession of property after his right to possession has ceased and does not assert a claim to superior title. RESTATEMENT (FIRST) OF PROPERTY § 22 (1936). A tenant at sufferance is not in privity with the owner and possesses no interest capable of assignment. *Goggins*, 849 S.W.2d at 377 (no privity); *Griffin v. Reynolds*, 107 S.W.2d 634, 637 (Tex.Civ.App.— Texarkana 1937, writ dism'd) (not assignable).

■ That there existed a landlord-tenant relationship between the Arkuses and Appellee is undisputed. Indeed, the record contains an instrument entitled Agreement of Lease, which embodies this relationship. Neither is it disputed that there exists no similar instrument evincing a landlord-tenant relationship between Appellant and Appellee. Thus, if one exists, we must infer it from the facts and circumstances of the case.

■ When a tenant's landlord-mortgagor is foreclosed upon by the landlord's mortgagee, the tenant's lease is generally terminated. *B.F. Avery & Sons v. Kennerly*, 12 S.W.2d 140 (Tex.Comm'n App.1929, judgm't adopted) (original mortgagee who was also purchaser at foreclosure sale held clear title unencumbered by lease executed by mortgagor subsequent to mortgage, notwithstanding that tenant was not made a party to the foreclosure suit); *Gainesville Oil & Gas Co. v. Farm Credit Bank of Texas*, 847 S.W.2d 655 (Tex. App.—Texarkana 1993, no writ) (purchaser at foreclosure sale held clear title unencumbered by oil and gas lease executed by mortgagors subsequent to execution of mortgage, notwithstanding that purchaser had actual knowledge of oil and gas production at time of purchase); *Bateman v. Brown*, 297 S.W. 773 (Tex.Civ.App.—Amarillo 1927, writ dism'd) (foreclosure sale effected "eviction [of mortgagor's tenant] by paramount title," which eviction caused termination of tenant's lease). We cautiously characterize the foregoing proposition as general because of case law that arguably pronounces a contrary rule.

There is aged authority for the proposition that a tenant is a necessary party to a foreclosure action against his landlord. In *Lockhart v. Ward, Dewey & Co.*, 45 Tex. 227 (1876), the Texas Supreme Court held that the tenant could assert his rights as a tenant against Lockhart, the purchaser at a foreclosure sale, when Lockhart sued to evict the

tenant from the property. The Court found that a tenant has a right to redeem a mortgage and if he is not a party to the foreclosure action his first opportunity to assert that right is in the suit to evict him. Oddly, despite the foregoing pronouncement and the tenant's offer to redeem the mortgage, the Court awarded possession to Lockhart. *Id.* at 231. The Court's disposition of the property supports the conclusion that the failure to join the tenant as a party to the foreclosure merely meant that the foreclosure proceedings did not conclusively determine the tenant's rights, not that the tenant actually had any greater rights. This conclusion is concededly at odds with the Court's clear pronouncement of a tenant's right to be made a party to a foreclosure. But because we place greater weight on the Court's action or holding than we do on its rhetorical aside or dictum, we think *Lockhart* insufficient to establish a tenant's right to enforce a lease against a foreclosure sale purchaser.

Even if we interpret *Lockhart* wrongly, we find that *Lockhart* was overruled, albeit *sub silentio,* by the Supreme Court's adoption of the Commission of Appeals' judgment in *Kennerly,* 12 S.W.2d at 140. Presented with similar facts, the *Kennerly* Court acknowledged that the tenant's rights were not determined when his landlord's mortgagee foreclosed on the property. *Id.* [Citing *Lockhart*]. In *Kennerly,* the Court found that:

> The leased premises having been sold during the lessee's term under a decree foreclosing a mortgage given before the lease, and of which it had notice, gave [sic] the purchaser a *title freed from the obligations of the lease.* While no process could have been issued under this judgment which could have operated to dispossess the lessee, yet, when [the foreclosure sale purchaser] obtained his deed, he became the legal owner of the property and entitled to its immediate possession.

Id. [Emphasis added]. Thus, although *Kennerly* purports to follow *Lockhart,* it effectively rendered void, if only indirectly by its refusal to afford a remedy for the violation of, the rule that tenants of mortgagors are necessary parties to foreclosure proceedings. Moreover, *Kennerly* expressly found the lease terminated by the foreclosure sale. The quotation's italicized phrase is subject to no other construction [1].

We find modern application of the above rule in *Gainesville,* 847 S.W.2d at 655, where the lessee, an oil and gas producer, sought to impose its interest in the property on the foreclosure sale purchaser. The lessee argued that because the purchaser had actual knowledge of its current production of oil and gas on the property he should be held to have purchased subject to its lease. The court found the rule so well settled that even the purchaser's actual knowledge of the lessee's activities did nothing to cloud his title. *Gainesville,* 847 S.W.2d at 658. The Court concluded that the purchaser held clear title unencumbered by the lessee's interest in the property. *Id.*

Although less than clear, Appellee in her brief does not expressly controvert the foregoing analysis. She does, however, implicitly challenge it by arguing that the landlord-tenant relationship between her and the Arkuses continued after foreclosure, with Appellant assuming the position of landlord. Appellee relies primarily on this Court's opinion in *United General Ins. Agency of Midland v. American Nat'l Ins. Co.,* 740 S.W.2d 885 (Tex.App.—El Paso 1987, no writ). That case involved a commercial tenant, United General, that refused to pay rent to American National, the purchaser at the foreclosure sale. American National sought to hold United General to the terms of United General's lease with American National's

---

1. We recognize that the first clause of the quotation's second sentence arguably vindicates Appellee. That clause, however, concerns the foreclosure sale purchaser's *power* to forcibly evict a tenant, a matter with which our analysis is unconcerned. The parties do not dispute Appellant's ultimate power to evict. They argue only over the *manner* in which Appellant evicted Appellee. Further, the argument in their briefs reveals that they recognize that tort liability for the manner of Appellee's eviction turns initially on the existence of a legal duty, and both parties urge us to examine only the landlord-tenant relationship as a source of duty. Thus, we consider the foregoing quotation primarily for the light it sheds on the existence of a landlord-tenant relationship between Appellant and Appellee subsequent to foreclosure.

mortgagor. We found that the continuation in possession by United General, without more, did not establish an agreement to pay rent pursuant to United General's lease with American National's mortgagor. *Id.* at 886. We then held that American National could not hold United General to the terms of the lease because the evidence did not establish that both parties consented to United General's payment of rent subsequent to the foreclosure. *Id.* at 887.

Appellee places greatest emphasis on the following passage in *United General:* "[T]he sale under foreclosure gives the right to the purchaser to either terminate the lease or continue it in force with the tenant's consent, but does not of necessity terminate the lease." *Id.* [Citing *Peck & Hills Furniture v. Long,* 68 S.W.2d 288, 289 (Tex.Civ.App.— Fort Worth 1934, no writ) ]. Appellee seizes on this proposition and argues that there existed between her and Appellant a landlord-tenant relationship because Appellant took no affirmative action to terminate her lease. In *United General,* this Court neither elaborated on the quoted statement nor discussed the authority we cited therefor. Appellee's argument now requires both.

A cursory reading of the quoted passage reveals that it contravenes the proposition that a foreclosure terminates a tenant's lease, which proposition we earlier concluded to be the general rule. How, after all, can the parties continue by consent that which has been terminated by law? A careful examination, however, of *United General* and *Peck & Hills* reveals that any contradiction arises from the cases' imprecise use of the term "continue."

*Peck & Hills* involved a commercial subtenant seeking to avoid a judgment in favor of the foreclosure sale purchaser for rent due under the original tenant's lease with the mortgagor. Before holding that the subtenant's lease from the original tenant was entered into for the benefit of the owner, the court set out the law as follows:

> There is no merit in the further contention that the sale of lot 11 under foreclosure after the lease had been executed necessarily established a termination of the lease, as a conclusion of law. The sale

under foreclosure gave the right to the purchaser to either terminate the lease or to continue it in force with the tenants' consent. If, subsequently [sic] to the foreclosure, the purchaser and the lessee and the ... subtenant[ ] elected to treat the lease as still subsisting and thereafter rents were paid by [the subtenant] with full knowledge of the foreclosure sale, in accordance with the terms of the original lease ... then there was an implied agreement between the [purchaser and the subtenant] for a continuation of the lease as originally made upon the same terms, with the [purchaser] substituted as landlord in place of ... the original lessors.

*Peck,* 68 S.W.2d at 289–90. The court took care to find that the parties' conduct resulted in "an implied agreement ... for a continuation of the lease." The *Peck & Hills* court failed, however, to cite *Kennerly,* 12 S.W.2d 140, which we earlier found to terminate a tenant's lease upon foreclosure. That *Peck & Hills* fails to cite *Kennerly,* the opinion of a superior court, does not necessarily mean that the *Peck & Hills* court deliberately chose to ignore apparently binding precedent. To the contrary, a close reading of both *Peck & Hills* and *Kennerly* leads us to conclude that the foregoing quotation from *Peck & Hills,* its use of the term "continuation" notwithstanding, is faithful to the rule of *Kennerly.*

*Kennerly* deems a tenant's lease at an end upon foreclosure. It does not prohibit the tenant and the foreclosure sale purchaser from independently entering into a new landlord-tenant relationship. Although we employ the phrase reluctantly, such a prohibition would amount to an unprecedented and unjustifiable infringement of the parties' freedom of contract. *Peck & Hills* merely recognizes the parties' freedom to enter into a new contractual relationship. Despite use of the term "continuation," we construe *Peck & Hills* to refer to a landlord-tenant relationship the origins of which are altogether independent of the tenant's previous lease. Specifically, we construe *Peck & Hills* statement that a foreclosure sale does not conclusively terminate a tenant's lease to mean that a foreclosure sale does not erect a legal barrier

to the formation of an independent landlord-tenant relationship between the tenant and the foreclosure sale purchaser. This construction is supported by language in the earlier quotation that queries whether the parties "elected to treat the lease as still subsisting," for one does not attribute significance to conduct that treats "as still subsisting" that which would have subsisted in any event. That *Peck & Hills* holds the parties to the terms of the previous lease does not alter our conclusion. It is the *origins* of the new contractual relationship that are independent of the prior lease, not necessarily the substance of the relationship. *Peck & Hills* merely recognizes that if the parties are capable of independently entering into a new landlord-tenant relationship, they are equally capable of electing to model their relationship after the terms of a known instrument, which is likely conveniently available to both parties. Further, our construction allows for the quite reasonable inference that because *Peck & Hills* expressly undertakes the precarious task of implying a contractual agreement between the parties, the court wisely looked to an existing instrument to which at least one party had previously assented to establish the terms of the implied agreement, rather than arbitrarily imposing on the parties terms of its own choosing.

Our understanding of the distinction between the continuation of a lease and the creation of a new lease is not undermined by this Court's previous decision in *United General.* Although we cited *Peck & Hills* for the same proposition for which Appellee cites it, we found it unnecessary to pontificate about the significance or consequences of the distinction. After stating that "the continuation in possession by the tenant, without anything else, does not establish an agreement," *Unit-*

ed *General,* 740 S.W.2d at 886 [citing *Wootton v. Bishop,* 257 S.W. 930, 932 (Tex.Civ. App.—Amarillo 1923, writ ref'd) ], we found a lack of evidence that both parties consented to pay rent after foreclosure, which, in the present context, equates to a lack of evidence that both parties consented to enter into a new lease. Our focus was the necessity for both parties to have affirmatively manifested consent to a new lease agreement, not the extent to which either had failed to object to the mere continuation of a previous agreement. To the extent we implied a different focus, we now disavow it.

The import of the foregoing analysis for Appellee is great. It renders irrelevant her argument that Appellant failed to take action to terminate her lease. This argument erroneously presumes the lease was capable of surviving without affirmative action by Appellant. Because the foreclosure sale conclusively terminated Appellee's lease, Appellant's post-foreclosure conduct could only revive the lease, or, more precisely, create by implication a new lease the terms of which would be supplied by the previous one.

Although Appellee clearly manifested her desire to lease the property after foreclosure [2], Appellant through its repeated refusals to accept rent from Appellee revealed only unwavering disinterest in leasing the house to Appellee. Appellant's indefinite instructions to Appellee to "sit tight" until it obtained clear title to the property are insufficient as a matter of law to give rise to a new lease between Appellant and Appellee. While this conduct might be sufficient to bind Appellant to a lease capable of continuing after foreclosure, it does not justify a decree binding Appellee to a new contractual relationship [3]. Therefore, we find that no land-

---

2. Appellee's consent is irrelevant in the first step of the analysis because of the apparent asymmetry in the standards by which the conduct of the tenant and the foreclosure sale purchaser is measured. *Peck & Hills* gives the right to the purchaser to, in its language, "continue" the lease and requires the tenant's consent only if the purchaser so elects. *Peck & Hills,* 68 S.W.2d at 289. Thus, our first concern, given our construction of *Peck & Hills,* is whether Appellant affirmatively agreed to enter into a lease contract with Appellee.

3. We do not sanction Appellant's conduct. Whether or not Appellant's is the species of conduct for which tort law was conceived as a remedy, we think a jury could have found that Appellant undertook some legal duty by reassuring Appellee that she should remain in the house and that it could not act until it obtained clear title. The parties, however, submit no argument to this effect, and direct us only to the landlord-tenant relationship as the potential source of any legal duty. The parties' briefs reveal this failure to be largely a product of the limits placed on the sources of legal duty in the context of a claim for

lord-tenant relationship between the parties existed after foreclosure of the property.

Having found that there existed no landlord-tenant relationship between Appellant and Appellee after foreclosure, we conclude that Appellant owed no duty to Appellee the violation of which could support the jury's finding that Appellant was negligent. Accordingly, we sustain Appellant's first point of error. Our disposition of Appellant's first point of error makes it unnecessary for us to address its second through fifth and sixth through tenth points of error, all of which complain of the sufficiency and weight of the evidence to support a finding and judgment of negligence and various damages predicated thereon.

■ In its fifth point of error, Appellant attacks that portion of the trial court's judgment that awards Appellee $4,000 for the difference in the value of her personal property immediately before and after her eviction. Appellant claims this award is inconsistent with the jury's answer to Question No. 3, in which it found that Appellant did not convert Appellee's personal property. In her only cross-point of error, Appellee contends the trial court should have disregarded the jury's determination regarding conversion.

We set out below the conditional instructions to Question No. 5 of the court's charge to the jury, omitting "sic" notations in favor of this disclaimer that errors and irregular spacing appear in the original:

> If you answered Question 1 Question 3, "Yes", then answer Question 5. Otherwise, do not answer Question 5.

Question 5 went on to ask the jury to determine the difference in the market value of Appellee's personal property. Question 1 queried whether Appellant's negligence proximately caused "the occurrence in question."

The court's instructions, the propriety of which neither party appeals, erroneously conditioned the award for property damage on two underlying causes of action. Whether it was conditioned on either or both is not clear because of the omission of a conjunction from the charge. Our earlier finding that Appellant owed Appellee no legal duty, however, obviates the need to resolve this ambiguity.

The jury in Question 3 found that Appellant did not convert Appellee's personal property. We earlier found that Appellant owed Appellee no legal duty, which finding renders moot the jury's determination that Appellant's negligence proximately caused Appellee's eviction. These two are the only causes of action submitted to the jury. No other causes of action are available to support any award of damages. Accordingly, Appellant's fifth point of error is sustained and Appellee's cross-point of error is overruled.

Having sustained two of Appellant's points of error and having overruled Appellee's cross-point of error, we reverse the judgment of the trial court and render judgment in favor of Appellant.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION ON MOTION FOR REHEARING

BARAJAS, Chief Justice.

In a motion for rehearing, Appellee claims that at the time of trial she was entitled to rely on the viability of a cause of action for negligent infliction of emotional distress as recognized by the Texas Supreme Court in *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649 (Tex.1987). Because the Texas Supreme Court overruled *Garrard* in *Boyles v. Kerr*, 855 S.W.2d 593, 595 (Tex.1993), which issued several months after trial in the instant case, Appellee maintains that she is entitled to a

negligent infliction of emotional distress by the Texas Supreme Court in *Boyles v. Kerr*, 855 S.W.2d 593 (Tex.1993). While we do not criticize that case, we attribute the harsh result in the instant case to the muddled difficulty of reviewing Appellee's negligence claim by using the enigmatically related criteria of property law to evaluate Appellant's conduct. Further, we recognize the potential for our decision to effectively immunize foreclosure sale purchasers from lia-

bility to their mortgagees' tenants for negligent infliction of emotional distress so long as they take care to withhold assent to a new lease agreement. We find, however, our decision mandated by the manner in which the parties frame the issue and think this outcome the predictable result of an unpleasantly oblique confluence of tort law duties and duties imposed by the law of property.

new trial to pursue other legal theories that may support recovery.

We have broad discretion to remand for a new trial in the interest of justice where it appears that a party may have proceeded under the wrong legal theory. *Boyles v. Kerr*, 855 S.W.2d at 603. Remand is particularly appropriate where the losing party may have presented his case in reliance on controlling precedent that was subsequently overruled. *Id.; Wackenhut Corp. v. Perez*, 865 S.W.2d 85, 86 (Tex.App.—Corpus Christi 1993, writ denied). Further, we may limit the issues that may be raised on remand. *Wackenhut Corp. v. Perez*, 865 S.W.2d 86, 87 (Tex.App.—Corpus Christi 1993, writ denied).

We recognize that Appellee may have relied at trial on a subsequently overruled legal theory. The appropriate time to seek relief on this ground, however, was on original submission in this Court, not on rehearing. We note that the *Boyles* decision was issued on May 3, 1993. Appellant filed its brief with this Court on September 9, 1993, arguing that *Boyles* barred Appellee's recovery absent some independently cognizable legal duty. Appellee's brief was filed on October 19, 1993. Although she cited *Boyles* in her brief, her interpretation of the case largely coincided with Appellant's, and she argued only that *Boyles* presents no bar to her claim because landlord-tenant law provides the requisite independent legal duty. The instant case was ultimately set for oral argument on October 17, 1994, more than a year after *Boyles*, yet, it is at rehearing that Appellant, for the first time, advances a request for a new trial based on her inability to anticipate the post-trial ramifications of *Boyles*. Rehearing is not an opportunity to test alternative arguments after finding other arguments unsuccessful. Having been given ample opportunity, Appellee should have assigned the argument she now presses as a cross-point of error on original submission and expressly prayed for a new trial based on the unforeseen consequences of *Boyles v. Kerr*. Her failure to do so leaves us disinclined to effectively allow her a second opportunity to bring her complaint. Our decision should not, however, be interpreted as a bar to a new trial in a case where the proper alternative relief and the supporting argument therefor were timely presented. We overrule Appellee's motion for rehearing.

On rehearing, the parties for the first time emphasize the temporal relationship between Appellee's lease and the pre-existing lien on her home that was held by Appellant. We think it prudent to make clear that our opinion neither results exclusively from nor purports to alter the general rule that foreclosure destroys all interests junior to the mortgage being foreclosed.[1] *See Med Center Bank v. Fleetwood*, 854 S.W.2d 278, 284 (Tex.App.—Austin 1993, writ denied) (finding that foreclosure sale purchaser becomes new landlord if lease was executed before the deed of trust pursuant to which the property is foreclosed upon) (citing *United Gen. Ins. Agency v. American Nat'l Ins. Co.*, 740 S.W.2d 885, 886 (Tex.App.—El Paso 1987, no writ)). While Appellee's lease was junior to Appellant's lien on her home and was therefore terminated by foreclosure, the analytical crux of our opinion concerns the extent to which the parties by their post foreclosure conduct entered into a new relationship. Thus, the general rule of temporal priority does not dispose of Appellee's claims, although it supports the general rule we announced in our opinion and abbreviates the method by which we arrived at it.

---

1. Neither does our opinion purport to address the status of a foreclosure sale purchaser relative to a lessee whose lease is senior to the foreclosed upon mortgage, which purchaser the general rule instructs takes subject to the pre-existing lease.