TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-00-00719-CV







Reagan National Advertising of Austin, Inc., Appellant



v.



Lakeway 620 Partners, L.P. and Hill Country Sign, L.L.C., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. GN001420, HONORABLE ERNEST C. GARCIA, JUDGE PRESIDING 







 Following a sale of property, Reagan National Advertising of Austin, Inc. ("Reagan")
asserted an interest, by its lease terms, in a billboard and in the parcel of property on which the sign
is located. After Lakeway 620 Partners, L.P. ("Lakeway") foreclosed two liens and purchased the
property at the foreclosure sale, it sued Reagan, (1) seeking declaratory relief to quiet title (2) and asserting
a claim under the Texas Home Solicitation Act. (3) Reagan appeals from an order in which the district
court granted Lakeway's motion for summary judgment and denied Reagan's motion. Because we
find that a genuine issue of material fact exists, we reverse the district court judgment.



Factual Background

 From 1983 to October 1999, Edward and Elvira Trevino ("the Trevinos") owned the
disputed property in the City of Lakeway known as 1901 Ranch Road 620 South. In December
1983, the Trevinos leased a portion of their property to the outdoor advertising company, Foster &
Kleiser, for the purpose of erecting and maintaining a billboard. The lease allowed for a term of
three years and stated that the agreement would be automatically renewed unless either party
provided written notice of termination within sixty days of the end of a term. The lease further
recited that Foster & Kleiser owned the sign and had the right to remove it at any time during a lease
term or after the lease expired. Foster & Kleiser later merged with the Patrick Media Group, which
Reagan acquired in 1992. Reagan thus claims that it was a successor-in-interest to the lessee, Foster
& Kleiser. 

 Between 1987 and 1992, ad valorem taxes accrued and became delinquent on the
Trevinos' property. On August 11, 1993, Travis County, Water Control Improvement District No.
17, Travis County Rural Fire District No. 5, Lake Travis Independent School District, and the
County Education District obtained a judgment ordering the Trevinos to pay $83,845.65 in
delinquent taxes. The judgment also attached a lien to the property for the amount of the taxes and
additional sums awarded in the judgment.

 In the years following the judgment, taxes continued to accrue and become delinquent
on the property. On July 9, 1999, Travis County, Water Control Improvement District No. 17, Lake
Travis Independent School District, the County Education District, the City of Lakeway, and Travis
County Emergency Services District No. 6 filed another suit against the Trevinos seeking to recover
$147,835.13, the delinquent taxes including penalties and interest that had accrued on the property
since 1987. At about the same time, the Trevinos began to take steps toward selling their property
in Lakeway. Brent Devere, Vincent Hazen, and Paul Terrill expressed an interest in purchasing the
property and entered into discussions with the Trevinos.

 Meanwhile, in early August 1999, Wayne King, a Reagan sales representative,
telephoned the Trevinos to propose a new lease agreement for the billboard. (4) The Trevinos agreed
to meet with King in their home to review the terms of the new lease. At the end of this meeting,
on August 19, Reagan and the Trevinos signed a new lease for the billboard.

 The new lease provided for a lease term of ten years at a rate of one thousand dollars
per year. Other lease terms included provisions naming Reagan as the owner of the sign and
permitting termination of the lease only with notice ninety days prior to the end of its term; a
restriction that barred the Trevinos, upon termination of the lease, from further leasing the billboard
for a period of five years; a right to written notice of the Trevinos' intent to sell their property during
the lease term; and a right of first refusal to purchase the entire Trevino property. Rather than record
a copy of the new lease in the real property records in Travis County, Reagan filed a memorandum
of the lease.

 As Devere, Hazen, and Terrill inquired into the Trevinos' property and researched
the various encumbrances that clouded its title, they turned their attention to Reagan's billboard
lease. Because searching the real property records revealed only a memorandum of the lease, which
lacked any specific terms of the lease agreement, they sought further information about the lease
from the Trevinos. The Trevinos informed the prospective buyers that they had signed a ten-year
lease with Reagan for one thousand dollars per year, but had not received a copy of the lease. 
Devere, Hazen, and Terrill then contacted Reagan seeking to obtain a copy of the lease, but Reagan
refused their request citing confidentiality reasons.

 Without seeing the actual terms of the lease, the prospective purchasers continued to
move forward on purchasing the Trevinos' property. In October 1999, in his capacity as president
of the general partner, Devere executed and filed a certificate of limited partnership for 1901 RR 620
South, L.P. ("1901 L.P.") with the Secretary of State. Devere, Hazen, and Terrill were named as
limited partners. The next day, 1901 L.P. purchased the Trevinos' property.

 Approximately two weeks after its purchase, 1901 L.P. sent Reagan a copy of its
general warranty deed and requested a copy of the lease for the billboard. In addition to complying
with 1901 L.P.'s request, Reagan responded with a letter asserting that the Trevinos had not notified
Reagan of their intention to sell the property as the lease terms required and that the lease provided
Reagan with a right of first refusal to purchase the property. Reagan further requested a copy of
1901 L.P.'s purchase agreement so it could review the terms and conditions of the sale. Instead of
sending Reagan a copy of the purchase agreement, 1901 L.P. provided Reagan with a copy of the
1993 tax judgment that imposed a lien ("1993 tax judgment lien") on the property for delinquent
taxes and a copy of the original petition in the 1999 suit that local taxing authorities had filed against
the Trevinos. According to these documents, as of July 1999, Travis County and other local taxing
units claimed that the Trevinos owed approximately $150,000 in delinquent taxes, and the federal
government held tax liens in excess of $500,000 on the property. The following week, in its reply
to 1901 L.P., Reagan elected not to exercise its right of first refusal on the property, but stated that
it expected all other lease terms to remain in full force and effect. 

 In response, 1901 L.P. informed Reagan that it would like to negotiate a new lease 
before the end of November. Reagan rejected the proposed lease and did not extend a counteroffer. 
One week later, in a letter to Reagan, 1901 L.P. stated that it had not paid the delinquent taxes, that
it would not undertake any effort to halt foreclosure of the property, and that it intended to
repurchase the property, free of all encumbrances, at a foreclosure sale. 1901 L.P. also sent Reagan
documents concerning Travis County's pending tax suit, which now named the Trevinos, 1901 L.P.,
and Reagan as defendants. Almost one month after waiving its right of first refusal, Reagan wrote,
"Because we now believe that information regarding the liens is substantially incorrect, Reagan . .
. hereby informs you that it expects its right of first refusal to be fully honored as to 1901 RR 620
South and any prior indications to the contrary are hereby retracted." Reagan also made a formal
appearance in the Travis County tax suit.

 On January 18, 2000, Devere, Hazen, and Terrill formed another limited partnership, 
Lakeway 620 Partners, L.P. ("Lakeway"). Three days later, 1901 L.P. filed a document entitled
"Transfer of Judgment Tax Lien," which authorized Lakeway to pay the taxes owed under the 1993
tax judgment and requested that Travis County, the holder of the 1993 tax judgment lien, transfer
it to Lakeway upon receiving payment. See Tex. Tax Code Ann. § 32.06 (West Supp. 2001). The
transfer document specified that taxes for 1991, 1992, and 1993 were still owed and amounted to
$36,184.91. In addition, according to the terms of a promissory note (5) between the two parties, 1901
L.P. promised to pay Lakeway $36,184.91. In this document, 1901 L.P. also acknowledged that
"payment of the note is secured by the above-described Judgment tax lien which is herein transferred
by said tax collector to Lakeway Partners."

 Lakeway paid the taxes and, in return, obtained the 1993 tax judgment lien. The same
day, 1901 L.P. and Lakeway executed a deed of trust, purporting to create a "First and Superior
Lien" ("2000 deed of trust lien") on the Trevino property. The deed of trust recited that it secured
payment of a note under which 1901 L.P. had promised to repay $36,184.91 to Lakeway. As
additional security, the deed of trust assigned to Lakeway all rents and revenues from the property,
but not the leases on the property. The deed of trust further declared that Lakeway assumed no
obligations as a lessor or landlord with respect to the property. In the deed of trust, 1901 L.P. waived
its right to require a one-year waiting period before foreclosure of the 1993 tax judgment lien. See
id. § 32.06(g). 

 When 1901 L.P. defaulted on the note, Lakeway foreclosed its 1993 tax judgment lien
and the 2000 deed of trust lien. The trustee under the deed of trust posted a notice of the foreclosure
sale at the courthouse door and filed the notice in the county clerk's office. See Tex. Prop. Code
Ann. § 51.002 (West 1995). The trustee also notified 1901 L.P., the debtor of record for the 2000
deed of trust lien, of the sale. On March 7, 2000, the trustee conducted the sale. Lakeway submitted
the highest bid, $36,184.91, and obtained the property. (6)

 On April 19, Devere, Hazen, and Terrill formed a limited liability company, Hill
Country Sign Company, L.L.C. ("Hill Country"). Six days later, Lakeway granted Hill Country a
perpetual easement in gross. The conveying instrument states that the purpose of the easement is
to permit Hill Country to maintain the billboard; to lease, use, or rent the billboard commercially;
and to operate the billboard. Reagan learned of Hill Country's formation and easement in mid-May.

 On April 27, Reagan again sent a letter to 1901 L.P., demanding that its right of first
refusal be honored. Reagan asserted that it was electing to exercise its right of first refusal and that
it would purchase the Trevino property for $265,645.71, the consideration that 1901 L.P. paid the
Trevinos. 


Procedural Background

 Lakeway filed a declaratory judgment suit against Reagan on May 15, 2000. (7) See
Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2001). Lakeway sought a
declaration to quiet title, namely, that it owned the property, including all of the fixtures and
improvements, free of any interest asserted by Reagan and that Reagan had no interest in the
property. On the same day, Hill Country notified Reagan that it had until May 25, 2000 to remove
its advertising from the billboard. To protect the billboard and its advertisements while the suit
proceeded, Reagan applied for a temporary restraining order and asserted a third-party claim against
Hill Country. Reagan also filed a counterclaim, asserting an interest in the property and requesting
that temporary and permanent injunctions be issued against Lakeway and Hill Country to protect the
advertising during the remainder of the lease's term, as well as Reagan's right to maintain, use, and
enjoy the billboard until the lease expires. On May 25, the district court granted Reagan's
application for a temporary restraining order against Lakeway and Hill Country.

 In early June, Lakeway amended its original petition to assert a claim that the
billboard lease was void because Reagan violated the Texas Home Solicitation Act by failing to
include statutorily required notices in the lease terms. See Tex. Bus. & Com. Code Ann. § 39.008(c)
(West Supp. 2001). On the same day, Lakeway moved for summary judgment against Reagan on
both claims raised in its petition, the declaratory judgment action to quiet title and the Texas Home
Solicitation Act violation. 

 On July 7, 2000, Reagan amended its application for injunctive relief, its
counterclaim, and its third-party petition to allege that the transfers to Lakeway and Hill Country
violated the Uniform Fraudulent Transfer Act (the "UFTA"), see id. §§ 24.001-.013 (West 1987 &
Supp. 2001), and constituted constructive and actual fraud. Reagan also moved for partial summary
judgment, claiming that the Texas Home Solicitation Act did not apply to the Reagan lease and that
the transfers between 1901 L.P., (8) Lakeway, and Hill Country and the foreclosure sale violated the
UFTA. Reagan later amended its answer to assert the affirmative defenses of fraudulent conveyance
and constructive fraud.

 After a hearing, the district court rendered judgment on August 11, 2000 on both
motions for summary judgment, granting Lakeway's motion and denying Reagan's motion. Reagan
filed a motion to modify, which requested that the district court clarify the basis for its ruling. 
During the hearing, the district court denied Reagan's request, but on the same day issued a modified
order that reiterated the earlier rulings on the motions and acknowledged the interlocutory nature of
both orders.

 On December 20, 2000, the district court rendered a final judgment, which repeated
its earlier rulings on the motions, denied Lakeway's request for attorney's fees, and ordered that
Reagan take nothing on its claim against Hill Country. Lakeway filed a motion to modify two days
later, urging the district court to address its requests for declaratory relief. The district court granted
the motion without a hearing and modified the final judgment to include a declaration that quieted
title to the property in Lakeway. Reagan filed a motion to vacate, which was denied. 


STANDARD OF REVIEW


 We review the propriety of a ruling on a motion for summary judgment de novo. See
Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994). According to the well-established
principles that govern summary judgments, (1) the movant for summary judgment has the burden
of showing that no genuine issues of material fact exist and that it is entitled to judgment as a matter
of law; (2) in deciding whether an issue of material fact precludes summary judgment, evidence
favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be
indulged in favor of the nonmovant and any doubts resolved in its favor. Nixon v. Mr. Prop. Mgmt.
Co., 690 S.W.2d 546, 548-49 (Tex. 1985). Once a movant has initially established a right to
judgment as a matter of law, the nonmovant must expressly present any reasons to avoid the
entitlement and must support the response with sufficient proof to establish a fact issue. City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678-79 (Tex. 1979); see Friendswood Dev.
Co. v. McDade + Co., 926 S.W.2d 280, 282 (Tex. 1996). When a nonmovant includes an
affirmative defense in its response to a motion for summary judgment, the nonmovant may preclude
summary judgment by raising a fact issue on an element of the movant's cause of action, (9) or by
relying on its own affirmative defense and presenting sufficient evidence to raise a fact issue on each
element of that defense. (10) Where, as here, the district court has not stated the grounds for granting
the motion, we may affirm the judgment if any of the grounds advanced in the motion has merit. See
State Farm Fire & Cas. Co. v. S.S. & G.W., 858 S.W.2d 374, 380 (Tex. 1993).


DISCUSSION


 Lakeway moved for summary judgment on the following two theories: (i) under the
Texas Home Solicitation Act, a lease solicited and executed in a home is void if it does not contain
the statutorily required notices and (ii) when a lease is executed after a court has attached a tax-judgment lien to the property and the lien has been recorded, the foreclosure of that lien extinguishes
the lease and any interest that the lessee may have had in the property. In particular, Lakeway argued
that because Reagan solicited and executed its billboard lease at the Trevinos' home, it was required
to comply with the Home Solicitation Act, which mandates certain notices. See Tex. Bus. & Com.
Code Ann. § 39.008(c). Lakeway asserted that Reagan's lease with the Trevinos did not include
these notices and therefore was void. Lakeway further argued that it was entitled to a declaratory
judgment to quiet title in the disputed property because by foreclosing the 1993 tax judgment lien,
it extinguished Reagan's lease and cut off any interest Reagan may have had in the property. See
Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc., 938 S.W.2d 102, 116 (Tex. App.--Houston
[14th Dist.] 1996, no writ).


Is Lakeway Entitled to Summary Judgment?

 The question before us then is whether Lakeway has conclusively established that it
was entitled to summary judgment. We will consider Lakeway's declaratory judgment claim first. 
Reagan contends in its brief that Lakeway sought summary judgment on the theory that the March
7, 2000 foreclosure sale extinguished Reagan's billboard lease. Lakeway disputes this contention
and argues that Reagan is confusing two distinct liens and two separate transactions. Lakeway
agrees that the March 7, 2000 foreclosure sale resulted from its foreclosure of the 1993 tax judgment
lien and the 2000 deed of trust lien. But Lakeway asserts that it sought summary judgment solely
based on its foreclosure of the 1993 tax judgment lien, the only lien that it held which was superior
to Reagan's billboard lease. In Lakeway's motion for summary judgment, it framed the issue as
follows: "Is a lease, taken subject to a pre-existing, duly recorded tax judgment, extinguished by the
foreclosure of that tax judgment?" (Emphasis added.) Lakeway thus contends that it did not base
its motion for summary judgment on its foreclosure of the 2000 deed of trust lien. Lakeway asserts
that to prevail on its motion, it had to show that a tax lien existed, that the lien was foreclosed, and
that the foreclosure extinguished all inferior interests in the property. 

 The foreclosure sale must also be valid. See B.F. Avery & Sons' Plow Co. v.
Kennerly, 12 S.W.2d 140, 140-41 (Tex. Comm'n App. 1929, judgm't adopted). To show that a valid
lien existed, Lakeway included in its summary judgment proof a copy of the 1993 final judgment in
which the district court ordered the Trevinos to pay the taxes they owed and also attached a lien to
their property. This copy of the judgment is certified by the district clerk of Travis County as
appearing in that office's records and bears the seal of the Travis County district courts.

 To prove that it held the 1993 tax judgment lien, Lakeway also included a certified
copy of a sworn document that evidences it obtained this lien after 1901 L.P. authorized and
requested it be transferred from Travis County to Lakeway. See Tex. Tax Code Ann. § 32.06. (11) 
Section 32.06 of the tax code, entitled "Transfer of Tax Lien," permits a person to authorize another
person to pay taxes on its real property. Id. § 32.06(a). A party seeking to transfer the tax lien must
file with the taxing unit's collector a sworn document that describes the property and confers
authorization to a named person to pay the taxes on the property. Id. Once the authorized person
pays the taxes, the collector is required to issue a certified, sworn document acknowledging payment. 
Id. § 32.06(b). To enforce a transferred tax lien, the transferee must record the lien in all applicable
county deed records. Id. § 32.06(d). The transferee is entitled to foreclose the lien. Id. § 32.06(c). 
This provision also prohibits the filing of a suit to foreclose on the transferred lien within one year
after the transfer unless the property owner and transferee agree otherwise. Id. § 32.06(g). 

 Here, Lakeway established through its proof that 1901 L.P. had authorized it to pay
the taxes owed on the property, that Lakeway had paid the taxes, and that the tax collector had issued
the required documents to acknowledge payment. See id. § 32.06(a), (b). In addition, Lakeway 
provided evidence that, after the transfer, it had recorded the 1993 tax judgment lien in the proper
deed records, rendering it enforceable, see id. § 32.06(c), and that 1901 L.P. had waived the one-year
waiting period for foreclosure in the deed of trust it gave to Lakeway. See id. § 32.06(g).

 To establish that it foreclosed the 1993 tax judgment lien (12) and that the foreclosure
sale was valid, Lakeway further offered a certified copy of sworn foreclosure documents. These
documents included a trustee's deed, a foreclosure affidavit with notices and correspondence
attached as exhibits, a notice of filing and posting, and the notice of trustee's sale, which was filed
and recorded with the Travis County clerk's office. Lakeway also presented, as summary judgment
evidence, a copy of Reagan's billboard lease with the Trevinos, dated August 19, 1999, six years
after the district court had attached the 1993 tax judgment lien to the property.

 As Lakeway correctly argues, a valid foreclosure of a lien terminates any leases
entered into subject to that lien. Kennerly, 12 S.W.2d at 140-41 (holding that original mortgagee
who purchased property at foreclosure sale held clear title unencumbered by lease that mortgagor
executed subsequent to mortgage despite the fact that tenant was not made party to foreclosure);
Twelve Oaks, 938 S.W.2d at 108-10; ICM Mortgage Corp. v. Jacob, 902 S.W.2d 527, 532 (Tex.
App.--El Paso 1994, writ denied); (13) Gainesville Oil & Gas Co. v. Farm Credit Bank, 847 S.W.2d
655, 657-58 (Tex. App.--Texarkana 1993, no writ). Reagan does not dispute this general rule.

 Because it is uncontroverted that the 1993 tax judgment lien existed, that this lien was
transferred to Lakeway, that Lakeway foreclosed this lien, that the foreclosure sale was valid, and
that Reagan's billboard lease was executed after the district court attached this lien to the Trevinos'
property, we conclude that Lakeway carried its initial burden of showing that no genuine issue of
material fact exists and that it is entitled to judgment as to this cause of action. Kennerly, 12 S.W.2d
at 140-41; Twelve Oaks, 938 S.W.2d at 108-10; Jacob, 902 S.W.2d at 132; Gainesville, 847 S.W.2d
at 657-58.


Has Reagan presented sufficient evidence to raise a fact issue to avoid summary judgment?

 Having concluded that Lakeway established its initial entitlement to summary
judgment, we now consider whether Reagan has presented any reason to preclude summary
judgment or sufficient proof to raise a fact issue. See Friendswood Dev. Co., 926 S.W.2d at 282; 
Clear Creek Basin Auth., 589 S.W.2d at 678-79. Because Lakeway has shown that it is entitled to
judgment as a matter of law, Reagan may preclude summary judgment by raising a fact issue on an
element of Lakeway's cause of action, (14) or by relying on its own affirmative defense and presenting
sufficient evidence to raise a fact issue on the elements of that defense. (15) 

 In six issues, Reagan argues that the district court erred when it granted Lakeway's
motion, alleging the affirmative defenses of fraudulent transfer and actual and constructive fraud. 
Reagan first asserts the district court's judgment could not properly be based on Lakeway's claim
under the Home Solicitation Act. See Tex. Bus. & Com. Code Ann. §§ 39.001-.009 (West Supp.
2001). Reagan maintains in its next three issues that sufficient evidence exists in the record to
establish a fraudulent transfer in violation of the UFTA, see id. § 24.005(a)(1), (2) & § 24.006(a)
(West 1987), as well as to show actual and constructive fraud. Reagan lastly contends that the
district court erred when it modified its final judgment to quiet title to the billboard in Lakeway. 
Because we have restricted our discussion so far to Lakeway's declaratory judgment claim, we will
first examine the affirmative defenses that Reagan raises to refute this ground, namely, fraudulent
conveyance and actual and constructive fraud. 

 The term "fraudulent conveyance" refers to a transfer made by a debtor who intends
to hinder, delay, or defraud creditors by placing assets beyond their reach. Nobles v. Marcus, 533
S.W.2d 923, 925 (Tex. 1976). The UFTA is designed to prevent such transfers of property. Connell
v. Connell, 889 S.W.2d 534, 542 (Tex. App.--San Antonio 1994, writ denied); see Harrisburg Nat'l
Bank v. Geo. C. Vaughan & Sons, 204 S.W.2d 9, 12 (Tex. Civ. App.--Galveston 1947, writ dism'd)
(stating that purpose of former version of section 24.005 was "to prevent debtors from taking their
property from view and placing it beyond the reach of their creditors"). The Act creates a statutory
cause of action for creditors seeking recourse for a fraudulent transfer. See Tex. Bus. & Com. Code
Ann. § 24.005 (West Supp. 2001) & § 24.006 (West 1987); see also Jackson Law Office v. Chappell,
37 S.W.3d 15, 25 (Tex. App.--Tyler 2000, pet. denied). The UFTA also addresses defenses
available to the transferee. Tex. Bus. & Com. Code Ann. § 24.009 (West Supp. 2001). A creditor
who prevails on a claim under the UFTA may obtain, among other remedies, avoidance of the
transfer. Id. § 24.008 (West 1987). By enacting the UFTA, the legislature intended the Act "be
applied and construed to effectuate its general purpose to make uniform the law with respect to the
subject of this chapter among states enacting it." Id. § 24.012.

 In its second, third, and fourth issues, Reagan argues that, because the transfers and
transactions between 1901 L.P. and Lakeway violated the UFTA, (16) it is entitled to avoidance of the
foreclosure to the extent necessary to permit it to continue to enjoy its lease and to enforce its right
of first refusal and its ownership of the billboard. See id. § 24.008. Reagan asserts the following
three theories to challenge the transfers and transactions underlying the foreclosure as fraudulent:
(1) Lakeway made a transfer with "actual intent to hinder, delay, or defraud any creditor"; (2)
Lakeway made a transfer without receiving a reasonably equivalent value; and (3) 1901 L.P. was
insolvent when a transfer was made or became insolvent as a result. See id. §§ 24.005(a)(1), (2),
.006(a). Lakeway correctly argues that Reagan must show "a transfer by a debtor of an asset that is
fraudulent as to a creditor." Lakeway maintains that unless Reagan satisfies these "prerequisites"
of the UFTA with respect to the transfer of the 1993 tax judgment lien, it cannot avoid the
foreclosure of that lien. 

 According to section 24.005(a)(1) of the UFTA, "[a] transfer made . . . by a debtor
is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time
after the transfer was made . . . if the debtor made the transfer with actual intent to hinder, delay, or
defraud any creditor of the debtor." Id. § 24.005(a)(1). To determine actual intent, we may consider,
among other factors, whether:


 (1) the transfer . . . was to an insider;


 (2) the debtor retained possession or control of the property transferred after the
transfer;


 (3) the transfer . . . was concealed;


 (4) before the transfer was made . . . the debtor had been sued or threatened with
suit;


 (5) the transfer was of substantially all the debtor's assets;


 (6) the debtor absconded;


 (7) the debtor removed or concealed assets;


 (8) the value of the consideration received by the debtor was reasonably equivalent
to the value of the asset transferred . . . ;


 (9) the debtor was insolvent or became insolvent shortly after the transfer was
made . . . ;


(10) the transfer occurred shortly before or shortly after a substantial debt was
incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who
transferred the assets to an insider of the debtor.



Id. § 24.005(b). Thus, Reagan must raise a fact question as to the following elements: (i) it is a
creditor, (ii) with a claim that arose before or within a reasonable time after, (iii) a debtor, (iv) made
a transfer, (v) with actual intent to hinder, delay, or defraud any creditor of the debtor." See id.
§ 24.005(a)(1).

 Reagan argues that it is a creditor by virtue of its right of first refusal under its
billboard lease. In the context of the UFTA, a creditor is "a person . . . who has a claim." Id.
§ 24.002(4). The term "claim" is defined in the Act to mean "a right to payment or property, whether
or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Id. § 24.002(3) (emphasis
added). A right of first refusal gives the holder the option to purchase the property. See Riley v.
Campeau Homes (Texas), Inc., 808 S.W.2d 184, 187-88 (Tex. App.--Houston [14th Dist.] 1991,
writ dism'd by agr.). Although Reagan's asserted right to the property, pursuant to its right of first
refusal, is the subject of litigation, disputed rights to property fall within the statutory definition. See
Tex. Bus. & Com. Code Ann. § 24.002(3). In addition, Reagan's claim, which arises from a 1993
billboard lease, clearly preceded the transfer of the 1993 tax judgment lien, the transfer it challenges
here. We find that Reagan has raised fact issues as to the first two elements.

 Reagan contends that, as a successor-in-interest to the billboard lease, 1901 L.P. is
a debtor for purposes of the Act. For purposes of the UFTA, the term "debtor" is defined as "a
person who is liable on a claim." Id. § 24.002(6) (West Supp. 2001). The billboard lease contained
a term granting Reagan a right of first refusal. 1901 L.P. acknowledges that it became the lessor
under this lease when it purchased the property. We find that Reagan has also raised a fact question
as to third element of its affirmative defense.

 The parties do not dispute that, by giving its consent, 1901 L.P. authorized Travis
County to transfer the 1993 tax judgment lien to Lakeway. See Tex. Tax Code Ann. § 32.06. Under
the UFTA, a transfer is "every mode, direct or indirect, . . . of disposing of or parting with an asset." 
Tex. Bus. & Com. Code Ann. § 24.002(12) (West Supp. 2001). An asset is defined as "property of
a debtor," excluding "property to the extent it is encumbered by a valid lien," "property to the extent
it is generally exempt under nonbankruptcy law," or "an interest in property held in tenancy by the
entireties." See id. § 24.002(2).

 Reagan argues that, by requesting and authorizing Travis County to transfer the 1993
tax judgment lien to Lakeway, 1901 L.P. directly participated in the disposition of an asset, namely,
the 1993 tax judgment lien. The asset that Reagan identifies in this argument does not fall within
the statutory definition of asset; because Travis County is not a debtor, the 1993 tax judgment lien
is not "property of a debtor." See id. But 1901 L.P., the debtor here, did make a transfer of an asset
when it gave Lakeway the deed of trust after the delinquent taxes were paid, which created the 2000
deed of trust lien. Therefore, viewing the evidence in the light most favorable to Reagan, we find
that a fact question exists as to this element of the affirmative defense.

 With respect to the final element, "actual intent to hinder, delay, or defraud any
creditor of the debtor," see id. § 24.005(a)(1) (emphasis added), Reagan contends that "the
transactions between 1901 L.P. and Lakeway, L.P. were undertaken with the intent and purpose of
destroying Reagan's claim under the lease [to ownership of the billboard] and claim to the right to
enforce its right of first refusal to purchase the property." "Intent is a fact question uniquely within
the realm of the trier of fact because it so depends upon the credibility of the witnesses and the
weight to be given their testimony." Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex.
1986). Ordinarily, the issue of fraudulent intent constitutes a question of fact to be determined by
a trier of fact. (17) Quinn v. Dupree, 303 S.W.2d 769, 774 (Tex. 1957) (stating that fraudulent intent,
as required under former statutory version of section 24.005, should be deduced from those facts and
circumstances that law considers badges of fraud and thus requires submission to trier of fact);
Coleman Cattle Co., Inc. v. Carpentier, 10 S.W.3d 430, 433 (Tex. App.--Beaumont 2000, no pet.)
(considering summary judgment claim under UFTA, which raised issue of intent to defraud);
Connell, 889 S.W.2d at 542 (deciding whether conveyance was made with intent to defraud for
purposes of UFTA and whether grantee knew or had notice of such intent constitute questions of
fact); see also Van Hook v. Walton, 28 Tex. 59, 73, 75 (1866) (holding that if circumstances reveal
indicia or badges of fraud rather than fraud per se, issue of whether party acted with "intent to
defraud" should be submitted to jury so they may draw their own conclusions). Reagan was not
required to establish the existence of such an intent conclusively; rather, it only needed to raise some
fact issue as to each element of this theory of the affirmative defense. See KPMG Peat Marwick, 988
S.W.2d at 750; American Petrofina, 887 S.W.2d at 830; Brownlee, 665 S.W.2d at 112.

 We find the recent opinion in Coleman Cattle Co., Inc. v. Carpentier instructive. 10
S.W.3d at 430. In that case, appellants asserted a claim of fraudulent conveyance under the UFTA,
requiring a showing of intent to hinder, delay, or defraud creditors. Id. at 433. The reviewing court
addressed "whether a trial court [may] grant summary judgment to a plaintiff when essential
elements of plaintiff's causes of action involve issues such as 'intent' and 'fraud[].'" Id. Appellants
argued that "such matters have traditionally been left to the province of a jury or other factfinder after
weighing all of the evidence and credibility of the witnesses." Id. When faced with evidence of
numerous facts and circumstances that appellants argued constitute "badges of fraud," the court
concluded that fraudulent intent can only be determined by evaluating the facts and circumstances
that surround the challenged transfers, and that a trier of fact should make this type of determination. 
Id. at 434-35. We find the court's analysis persuasive in this case.

 Here, Reagan argues that it has established fraudulent intent by presenting evidence
of the circumstances surrounding the challenged transactions and transfers, which indicate the
presence of several of the "badges of fraud" listed in the Act. See Tex. Bus. & Com. Code Ann.
§ 24.005(b). Specifically, Reagan alleges and has presented evidence that the transfer was made to
an "insider," that the transfer was concealed, that the transfer involved substantially all of 1901
L.P.'s assets, that reasonably equivalent value was not received, and that the transfer resulted in 1901
L.P.'s insolvency. See id. § 24.005(b)(1), (3), (5), (8), (9).

 As further evidence of "actual intent to hinder, delay, or defraud any creditor of the
debtor," Reagan directs us to five excerpts from the deposition testimony of Vincent Hazen, which
was offered as evidence in support of its motion for summary judgment. In the first exchange on
which Reagan relies, Hazen testified that he, Devere, and Terrill decided to form Lakeway after they
determined the dispute arising from Reagan's lease and its right of first refusal could not be resolved
and that their sole reason for forming Lakeway was to transfer the 1993 tax judgment lien to it and
foreclose the lien. Reagan also points to Hazen's testimony of the three partners' decision that they
had "to take care of getting rid of this encumbrance [Reagan's lease] off or the property would not
be marketable," reiterating that this was the reason for forming Lakeway. In this excerpt, Hazen also
explained that this decision was made after Reagan's counsel attempted to withdraw its prior waiver
of its right of first refusal and while the three partners were still attempting to "clean up the lease
terms." Reagan cites further portions of Hazen's testimony that address the formation and purpose
of Lakeway. In one exchange, after offering to stipulate to the reason why Lakeway was formed,
Hazen testified:


Why [we] did the transfer of [the] tax lien was to rid the property of the
encumbrances of the lease that Reagan was claiming they had, clearly. . . . [W]e told
you guys all along, that we were going to foreclose and buy at foreclosure sale if we
couldn't work out an amicable agreement, and Reagan never responded. That's why
we did it. That's exactly what we said we were going to do.



In a final deposition excerpt, Hazen repeated that the foreclosure was a means to rid the property
of the encumbrance that Reagan's lease placed on the property. (18) 

 Like the court in Coleman Cattle, we are faced with evidence of numerous facts and
circumstances surrounding multiple transactions, which are alleged to constitute "badges of fraud." 
Coleman Cattle, 10 S.W.3d at 433. As in that case, any determination of the presence or absence
of fraudulent intent based on this record will require a thorough evaluation of the facts and
circumstances surrounding the challenged transfers by a trier of fact. See id. at 433-35. We find
that Reagan has raised a fact question as to the final element of its affirmative defense.

 We are mindful of the underlying purpose of this state's summary judgment rules:
the elimination of "patently unmeritorious claims and untenable defenses." Casso v. Brand, 776
S.W.2d 551, 556 (Tex. 1989). While a trial court may ferret out and dispose of factually
unsupported claims or defenses at this pre-trial stage, it should not weigh the evidence, assess the
credibility of witnesses, or resolve issues of fact. Id. at 557 (acknowledging right to jury
determination of fact questions under Texas Constitution). To avoid stretching summary judgment
beyond its intended boundaries, we reserve choices between conflicting versions of the facts as
matters for the fact finder. Id. Thus, we conclude that, on the present record, this case is not
amenable to summary disposition. Because Reagan has raised a fact issue as to the elements of its
affirmative defense, we sustain Reagan's fourth issue.

 But because the district court did not expressly state the basis for rendering summary
judgment, we are required to uphold its grant unless Reagan has negated all possible grounds to
support the judgment. See State Farm Fire & Cas., 858 S.W.2d at 381; Carr, 776 S.W.2d at 569. 
In addition to its declaratory judgment claim, Lakeway moved for summary judgment based on a
claim under the Home Solicitation Act. See Tex. Bus. & Com. Code Ann. §§ 39.001-.009. 
Consequently, we consider whether Reagan, in its first issue, successfully negated this ground.

 Lakeway argues that because Reagan solicited its 1999 lease with the Trevinos by
contacting the Trevinos at their home and the parties signed the lease at the Trevinos' home, the
lease was subject to the Home Solicitation Act. See Tex. Bus. & Com. Code Ann. §§ 39.001-.009. 
Lakeway asserts that Reagan violated the Act by failing to comply with its notice requirement. See
id. §§ 39.004, .008. Reagan responds that the Act does not apply to the lease transaction.

 The legislature enacted the Texas Home Solicitation Act in 1973 to give consumers
the right to rescind transactions involving home solicitations. McDaniel v. Pettigrew, 536 S.W.2d
611, 614 (Tex. Civ. App.--Dallas 1976, writ ref'd n.r.e.). In addition, the Act requires that
consumers receive certain information and forms at the time of the transaction. Id. The Act further
delineates the rights and responsibilities, as well as the duties and liabilities, of the parties involved
in such transactions. Id. This enactment also provides penalties for violations. Id. But the
legislature expressly limited the scope of this Act to consumer transactions in which a seller solicits
a buyer as follows:


This chapter applies only to a consumer transaction in which the merchant or the
merchant's agent engages in a personal solicitation of a sale to the consumer at a place
other than the merchant's place of business, and the consumer's agreement or offer
to purchase is given to the merchant or the merchant's agent at a place other than the
merchant's place of business . . . .



Tex. Bus. & Com. Code Ann. § 39.002(a); see also McDaniel, 536 S.W.2d at 614. 

 This legislative purpose is also clear in the sections of the Act that provide remedies: 
each of these provisions speaks solely in terms of extending a remedy to consumers. (19) Tex. Bus.
& Com. Code Ann. §§ 39.003, .006, .008(c), (d). For example, a consumer may cancel a
transaction that falls under this Act any time within the first three business days after signing an
agreement or offer to purchase. Id. § 39.003. In addition, section 39.006 states that a consumer
may retain goods or right or title to real property until the merchant complies with the Act. Id.
§ 39.006. Furthermore, the Act permits consumers to recover actual damages, reasonable attorney's
fees, and court costs if a merchant has violated the Act. Id. § 39.008(c), (d). 

 Reagan first contends that Lakeway is not a "consumer," a prerequisite to invoking
rights and remedies under the Act. For purposes of the Act, a "consumer" is "an individual who
seeks or acquires real or personal property, services, money, or credit for personal, family, or
household purposes." Id. § 39.001(1). 

 Lakeway does not allege that it falls within the Act's definition of consumer. 
Lakeway has cited no case in which a person who is not the "consumer" has brought an action under
the Act. In determining whether a plaintiff is a consumer, our focus is on the plaintiff's relationship
to the transaction. Cf. Amstadt v. United States Brass Corp., 919 S.W.2d 644, 650 (Tex. 1996). 
We hold that Lakeway did not seek or acquire goods or services from Reagan and therefore is not
a consumer under this Act. Consequently, we conclude that Lakeway has not established its
entitlement to summary judgment on this ground. Accordingly, issue one is sustained. (20)


CONCLUSION


 Because we conclude that Lakeway did not carry its summary judgment burden as
to its claim under the Texas Home Solicitation Act and that Reagan has raised a genuine issue of
material fact on Lakeway's alternative ground for summary judgment, we reverse the district court's
judgment and remand this case for further proceedings.



 

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Reversed and Remanded

Filed: June 29, 2001

Do Not Publish

1. Reagan later filed a third-party suit against Hill Country Sign, L.L.C. ("Hill Country"). 
2. See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2001). 
3. See Tex. Bus. & Com. Code Ann. §§ 39.001-.009 (West Supp. 2001). 
4. In 1997, the City of Lakeway enacted a city ordinance that restricted the types of new
outdoor signs that could be displayed within the city limits. Specifically, the ordinance prohibited
new advertising billboards not located on an owner's premises.
5. While this note, as well as the deed of trust, are referenced in the transfer document, the
record does not contain a copy of the promissory note. 
6. In its First Amended Application for Injunctive Relief, First Amended Counterclaim, and
First Amended Third-Party Petition, Reagan claims that it learned of the foreclosure sale when the
district clerk's office notified it that an "Agreed Final Judgment" had been entered in the Travis
County tax lawsuit. On Reagan's motion, the judgment was vacated. Reagan did not attach to its
pleading, and has not included in the record before us, any documents to substantiate these
allegations.
7. Ten days earlier, Reagan had filed suit against the Trevinos, claiming an interest in the
property by virtue of the 1999 billboard lease. On May 12, Reagan amended its pleadings to assert
these claims against Lakeway. 
8. 1901 L.P. is not a party to this suit.
9. Tex. R. Civ. P. 166a(c); see also Wornick Co. v. Casas, 856 S.W.2d 732, 733 (Tex. 1993);
Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985).
10. KPMG Peat Marwick v. Harrison County Housing Fin. Corp, 988 S.W.2d 746, 749-50
(Tex. 1999); American Petrofina, Inc. v. Allen, 887 S.W.2d 829, 830 (Tex. 1994); Brownlee v.
Brownlee, 665 S.W.2d 111, 112 (Tex. 1984).
11. This document also identifies the location of the 1993 tax judgment in the Travis County
real property records.
12. The summary judgment proof shows that Lakeway also foreclosed the 2000 deed of trust
lien that 1901 L.P. gave Lakeway in exchange for a promissory note.
13. While several cases suggest that a foreclosure sale purchaser may terminate or continue
a lease taken subject to the lien that is later foreclosed, the Jacob court clarified that, while the
purchaser and tenant may act as if the lease is still in force, this conduct represents a new landlord-tenant relationship, rather than a continuation of the earlier lease. ICM Mortgage Corp. v. Jacob,
902 S.W.2d 527, 531-33 (Tex. App.--El Paso 1994, writ denied).
14. See Tex. R. Civ. P. 166a(c); see also Wornick Co., 856 S.W.2d at 733; Nixon, 690 S.W.2d
at 548-49.
15. KPMG Peat Marwick, 988 S.W.2d at 749-50; American Petrofina, 887 S.W.2d at 830;
Brownlee, 665 S.W.2d at 112. 
16. See Tex. Bus. & Com. Code Ann. § 24.005(a)(1), (2) (West Supp. 2001) & § 24.006(a)
(West 1987).
17. Courts have recognized that under certain circumstances "intent to defraud" can be
decided as a matter of law. See, e.g., In re Hinsley, 201 F.3d 638, 643 (5th Cir. 2000); BMG Music
v. Martinez, 74 F.3d 87, 90 (5th Cir. 1996) (holding that such intent may be conclusively established
when defendant admits fraud, face of conveying instrument is fraudulent, defendant retains an
interest inconsistent with conveyance, or evidence shows transfer was made without intent to
defraud); Coleman Cattle Co., Inc. v. Carpentier, 10 S.W.3d 430, 434 (Tex. App.--Beaumont 2000,
no pet.); Connell v. Connell, 889 S.W.2d 534, 542 (Tex. App.--San Antonio 1994, writ denied)
("where evidence indisputably shows that conveyance was not made with fraudulent intent and there
is no evidence tending to connect the grantee with any intent to defraud, the issue becomes one of
law").


 Reagan has not restricted its allegations to an "intent to defraud." This affirmative defense
may also be established by proving an actual intent to hinder or delay. See Tex. Bus. & Com. Code
Ann. § 24.005(a)(1).
18. Lakeway does not controvert this evidence. In an affidavit submitted as part of Lakeway's
summary judgment proof, Hazen averred, "There was no intent to hinder, delay, or defraud Reagan
in any of the actions taken in this matter." But the district court ruled that this statement was not
competent summary judgment evidence after Reagan objected to its conclusory nature. Lakeway
does not assert this point on appeal, and we do not consider it as evidence.
19. Section 39.009 permits the attorney general to seek injunctive relief in the name of the
State if he has reason to believe that a person is violating, or will violate, this Act. Tex. Bus. &
Com. Code Ann. § 39.009 (West Supp. 2001).
20. Given our disposition on Reagan's first and fourth issue, we need not reach its remaining
issues.


gan had filed suit against the Trevinos, claiming an interest in the
property by virtue of the 1999 billboard lease. On May 12, Reagan amended its pleadings to assert
these claims against Lakeway. 
8. 1901 L.P. is not a party to this suit.
9.