02-09-246-CV.REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00246-CV

 

KUV PARTNERS, LLC AND                                                             APPELLANTS

EILAT,
INC.

 

V.

 

WAEL FARES D/B/A                                                                             APPELLEE

FARES
CONSTRUCTION

 

------------

 

FROM THE 141ST
DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION ON
REHEARING[1]

 

------------

Upon
consideration of appellant KUV Partners, LLC’s motion for rehearing, we
withdraw our opinion and judgment of December 31, 2010 and substitute the
following to respond to an argument raised in the motion for rehearing.

In
this appeal from a bench trial seeking damages and foreclosure of a materialman’s
lien for the construction of improvements to leased premises, appellants KUV
Partners, LLC and Eilat, Inc. bring seven issues.  They challenge the legal and
factual sufficiency of the evidence to show that (1) KUV was part of a joint
venture to develop the leased premises as a restaurant, (2) Nabil Dimassi, the
sublessee of the leased premises, was an agent of KUV, (3) appellee Wael Fares
d/b/a Fares Construction is entitled to recovery under a quantum meruit theory,
and (4) appellee is entitled to recover damages from Eilat.  They also
challenge the trial court’s conclusion that Fares perfected and was entitled to
foreclosure of a materialman’s lien on KUV’s leasehold interest, its conclusion
that KUV is liable under the lease agreement to satisfy Fares’s materialman’s lien,
and its denial of a new trial or additional testimony based on newly discovered
evidence.  We reverse in part and affirm in part as modified.

Background

Javier
Mondragon, an employee of Texas Palomina’s restaurant in Arlington, Texas, met
real estate investors Moshe Epstein and Mac Hargrove and asked them to find a
restaurant for him to operate.  Epstein found a property at 4421 South Freeway,
Fort Worth, that had a Chinese buffet restaurant on it; he signed a lease with
the owner on behalf of KUV,[2]
in which he and Hargrove were the only members.  KUV promised to pay $10,000
per month for a sixty-month initial term with an opportunity to extend the
lease term.  The lease also allowed KUV to sublease the premises to “the
operating entity which will open the restaurant operations.”  The lease further
provided that any tenant improvements would remain on the premises and become
the property of the landlord at the expiration of the lease term.  Epstein
prepared a sublease of the premises to Mondragon, but Mondragon refused to sign
it.  Epstein then approached Nabil Dimassi, who owned the Arlington Texas
Palomina’s restaurant, among others. In June 2007, Dimassi signed a sublease
with KUV for $15,000 a month for an initial sixty-month term.  KUV agreed to
pay for all “utilities, connection charges, maintenance . . . , and repairs” to
the premises, as provided in its lease.  Any subtenant improvements were
required to comply with KUV’s master lease.

In
August or September 2007, Dimassi contracted with Wael Fares d/b/a Fares
Construction to construct improvements in the leased premises for the new Texas
Palomina’s.  According to Fares, Dimassi approved all of the work before it was
started.  Epstein was at the site almost daily during construction, and a man
named David Goran started paying Fares instead of Dimassi himself.  It was
Fares’s understanding from Epstein and Goran that Dimassi was in financial
trouble.  At Dimassi’s request, Fares started presenting invoices to Goran’s
company, DFW AUCE, Inc.  Eventually, Fares, Epstein, Hargrove, and Goran became
aware that Dimassi had filed for personal bankruptcy.[3] 
At that point, Dimassi was in default to both KUV and Fares.

Fares
stopped working at the site in November 2007 after he learned about the
bankruptcy.  KUV attempted to terminate Dimassi’s sublease but could not do so
because of the bankruptcy.  Eventually, KUV purchased Dimassi’s sublease from
the bankruptcy trustee for $11,000 and then subleased the premises to Eilat,
which is owned by Epstein’s family.  Eilat contracted with a third party to
finish the work Fares had started and opened a restaurant in the space named
Zorro’s Buffet.  Eilat also hired Dimassi as its general manager for the restaurant.

Fares
filed a materialman’s lien in February 2008.  In March 2008, he sued Ngai, L.P.—the
original owner of the premises and lessor under the master lease—KUV, and DFW
AUCE for (1) vicarious liability for Dimassi’s obligations under a single business
enterprise, joint venture, partnership, or alter ego theory, (2) breach of
contract, (3) quantum meruit, and (4) foreclosure of the materialman’s lien.  Fares
later added Eilat as a defendant.  After a bench trial before a visiting judge,
that judge signed a judgment awarding Fares $155,387.34 in actual damages from
KUV, DFW AUCE, and Eilat.  It also awarded trial and conditional appellate
attorney’s fees and ordered foreclosure of Fares’s materialman’s lien “against
the respective leasehold interests and improvements thereto of KUV . . . and
its subtenant, Eilat” with the sale proceeds to be credited to payment of the
judgment.  KUV and Eilat appealed from the judgment, but DFW AUCE did not.

Sufficiency
Challenges

In
the first, second, and fourth issues, KUV alleges that the evidence is legally
and factually insufficient to support the trial court’s findings and
conclusions supporting the judgment against KUV under theories of vicarious
liability, breach of contract, or quantum meruit.  In the third issue, KUV and
Eilat challenge the sufficiency of the evidence to support the trial court’s
findings and conclusions that Fares perfected a valid materialman’s lien
against KUV’s leasehold interest and Eilat’s sublease interest in the property.

Legal
and Factual Sufficiency Standards of Review

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No
Evidence” and “Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361,
362B63
(1960).  In determining whether there is legally sufficient evidence to support
the finding under review, we must consider evidence favorable to the finding if
a reasonable factfinder could and disregard evidence contrary to the finding
unless a reasonable factfinder could not.  Cent. Ready Mix Concrete Co. v.
Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh=g); Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965); In re King=s
Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Testimony

Because
much of the evidence in the four-day trial is pertinent to all of the
sufficiency issues, we will review it together.

Wael Fares

Fares
testified that he owns a construction company doing business as Fares
Construction.  In 2007, Dimassi asked Fares if he would be interested in
bidding on the “expansion” of Palomina’s in Fort Worth; Fares visited the site and
gave Dimassi a rough estimate.  The two shook hands and Fares started the work.

The
work started with the deposit of a $15,000 check written by Goran to Fares
Construction or Dimassi.  According to Fares, when he asked who Goran was, “they
told me this is somebody from the landlord, they paying for the remodeling, and
that would be the deposit check.”  Fares received various other amounts from
Goran during construction; he also received some payments from Dimassi.  In the
middle of the project, Dimassi wanted the billing to be changed from his name
to DFW AUCE.  Fares said that he knew DFW AUCE was “presided by” Goran.  The payments
to Fares were either checks from Goran’s personal account, checks from DFW
AUCE, or cash from Dimassi or Goran. Fares submitted all invoices to Dimassi,
however, by hand delivering them to him onsite.  Invoices admitted into
evidence were addressed to either Dimassi, Texas Palomina’s, or Goran at 4421
South Freeway.

Dimassi
told Fares he leased the building.  Fares testified that one day Epstein came
by the site looking for Dimassi; Epstein told Fares that Dimassi’s “landlord is
here.”  When Fares confused him for Goran, Epstein said that Goran was
Dimassi’s “business partner,” and Epstein was the landlord.  When Dimassi
arrived, Fares asked him who Epstein was, and Dimassi confirmed he was “one of
the landlords.”  Fares learned after starting work on the premises that Ngai
was the actual owner of the property and Dimassi was the sublessee.

Fares
testified that when he was hired, he was sure he was working for Dimassi, but
after the work started, he was not sure.  He became confused because Epstein
was “constantly there and involved.”  He saw Epstein up to six days a week at
the site.  However, Dimassi was the one to first meet with Fares and the
subcontractors to discuss his vision for remodeling the leased premises.  Dimassi
did not provide any blueprints; he simply told Fares what he was envisioning in
his mind.  When asked who made the decisions regarding the aesthetic aspects of
the building, Fares answered, “Primarily Mr. Dimassi, but has been [a] time
when Mr. Goran or Mr. Epstein has given their thoughts, and I would say
instructions to [Dimassi on] how things [should] be done, or discussed with the
subcontractor, but primarily . . . Dimassi, yes.”  Fares testified that he
later learned from Dimassi that Goran was Dimassi’s partner on this project in
“some type of a franchise.”

As
specific examples, Fares testified that Goran wanted the bathrooms redone and
had extensive discussions with Fares on how they should be redone.  Goran also
looked at carpet samples provided by Fares and instead went out and found a
different carpet for Fares to order.  Fares also testified that Epstein went
with Fares’s tile subcontractor to pick up the tile and pay for it.  He also
took the sneeze guard holder to Arlington to have it painted.  According to
Fares, Epstein “was . . . presiding on the site daily[;] always him and
[Dimassi] on the side discussing things.”

Fares
said that when it was time to hook up utilities, Dimassi originally said they
would be in the name of Palomina’s.  When the federal tax ID number for
Palomina’s was not satisfactory, Dimassi told Fares to put the utilities under
the name of DFW AUCE, “the operating entity of that franchise.”  However, DFW
AUCE’s federal tax ID number did not work either, so Goran suggested putting
the account under Epstein’s information.  Epstein agreed and provided his
social security number for the account.  Fares admitted on cross-examination that
it was not his responsibility to facilitate the provision of the utilities to
the premises and agreed that he was helping out by doing that because “it’s
helpful for the project for anyone to contribute to get that thing done.”

Payment
for the project fell behind.  Epstein told him they needed to finish the
project, and Fares would make jokes with Goran about when he would be getting
money.  Fares talked to all three of them about the money; Epstein said that
Dimassi was “choking” and they had to help him.  He testified that Goran told
him, “No matter what happen[s], I will sell cans and pay you.”

Fares
heard about Dimassi filing for bankruptcy in November 2007.  He stopped work
the first week of that month because of lack of payment.  At the time, there
was a $165,000 balance owed on the work.  Fares testified that he did not
perform any other work after that.

Fares
had met Hargrove at the site one day and was introduced to him as Epstein’s
partner.  Later, after Dimassi had declared bankruptcy, Fares met with Epstein
and Hargrove, and they talked about how to save the restaurant.  Fares
discovered that the Palomina’s restaurants were also in bankruptcy.  Epstein
and Hargrove discussed whether they could open the restaurant as Palomina’s
anyway and also discussed putting the lease in Goran’s name.  At a later
meeting with Epstein and Hargrove and a woman named Laura, Epstein introduced
Laura as follows, “She could be a potential partner with Goran in this venture”
at 4421 South Freeway.  When they asked how much it would cost to get the
restaurant open, Fares told them $50,000, but then he said that he would not do
the work until he was paid the $165,000 for the work he had already done. Epstein
and Hargrove offered to pay him only for the cost to finish or to pay him out
of revenue after they opened up the new restaurant, but Fares refused unless he
also received all of the past due amounts.

A
friend introduced Fares to Kaiss Alahmady in November 2007, and the two decided
to look into buying Palomina’s after the bankruptcy.  They formed KNW Group in
November 2007.  Fares had contributed $100,000 to KNW Group and was a 15%
minority member.  KNW Group purchased the building from Ngai in August 2008
while the suit was pending.

At
the time of trial, the restaurant had a sign for Zorro’s Buffet on it. 
According to Fares, Eilat owned Zorro’s; Epstein was the secretary, his wife
was the president, and one of his sons was the treasurer.  To the best of
Fares’s knowledge, there is still a lease to “Epstein, d/b/a KUV” with a
sublease to Eilat. Fares had been to Zorro’s; he knew that Dimassi and the
Epsteins worked there in different capacities.

On
cross-examination of Fares, the following exchange occurred:

Q.      Do you know whether
Dimassi and KUV had any common employees?

 

          . . . .

 

A.          
Nobody
I know.

 

Q.      Do you know if
Dimassi and KUV, during the course of this construction, had common offices?

 

A.      Not to my
knowledge.

 

Q.      Mr. Dimassi
and Eilat have common offices?

 

A.      Not to my
knowledge.

 

Q.      Did Mr.
Dimassi and KUV have common or centralized accounting?

 

A.      I have no access
to know if they do or not, but nothing to my knowledge, no.

 

Q.      Did Dimassi
or Eilat have any common or centralized accounting?

 

A.      I know he
works for Eilat.

 

Q.      As an
employee?

 

A.      I --

 

Q.      If you don't
know, you don't know.

 

A.      No, I do
know.  I’m trying to find the proper words without -- the previous counsel has
testified he's a controlling member of Eilat.  I don’t know what that means.

 

          . . . .

 

Q.      . . . Did Mr.
Dimassi ever pay the wages of employees of KUV or Eilat?

 

A.      I have no
idea.  Not to my knowledge.  I mean, I don’t know.

 

Q.      Did Mr. Dimassi
have a common business name with KUV or Eilat?

 

A.      To the best
of my knowledge, Eilat operate Zor[r]o Texas Buffet in Fort Worth at 4421 South
Freeway, and Nabil Dimassi [is] the owner of the website, Zor[r]o Texas
Buffet.  That much I can tell you.

 

Q.      The sign at
4421 South Freeway says what?

 

A.      Zorro’s, the
operating entity, Zorro’s Buffet.

 

Q.      What does the
sign say?

 

A.      I can’t
remember now, but I know it says Zorro’s.

 

Q.      Did Mr.
Dimassi ever have employees render services on behalf of KUV or Eilat?

 

A.      I can’t -- I
don’t know.

 

Q.      Are you aware
of any undocumented transfers of funds between KUV, Eilat, or Mr. Dimassi -- or
Mr. Dimassi and KUV or Eilat? 

 

A.      I do know
from the testimony of Mr. Epstein under oath in the Northern Bankruptcy Court
of Nabil Dimassi’s personal bankruptcy, giving the detail that the cash money
was paid to Mr. Epstein from the Palomina’s in Arlington by Nabil and Nabil’s
associates.

 

Q.      And what was
the -- what was the purpose of that payment?

 

A.      Different
testimony lead to paying deposits, and the master lease and -- I don’t know,
but I do know, yes, there was exchange of money paid from Nabil and his
associate to Mr. Epstein.  Now, in his personal capacity, or KUV member, I
cannot tell you.

 

Q.      Did KUV have
an agreement to share profits or losses with Dimassi’s proposed restaurant?

 

A.      I didn’t see
any.

 

Q.      Did Eilat
have any agreement to share profits or losses of Dimassi’s proposed restaurant?

 

A.      I didn’t see
any.

 

Q.      Did Dimassi
and KUV ever express an intent to be partners?

 

A.      I’m not aware
of that.  I don’t know.

 

Q.      Did Dimassi
and Eilat ever express an intent to be partners?

 

A.      Not to me.

 

Q.      Did KUV or
Eilat ever have a right to participate in Dimassi’s restaurant at 4421 South Freeway?

 

A.      I don’t know.

 

Q.      Did KUV or
Eilat ever agree to contribute money or capital to Dimassi’s restaurant?

 

A.      I don’t know,
except a meeting between KUV members both, Mr. Hargrove and Epstein, when they
offered me money to continue working, they were going to change the name of the
restaurant.  And the same party is still involved in that.

 

Q.      Did KUV or
Eilat ever agree to contribute money or capital to Dimassi?

 

A.      I don’t know.

 

Q.      Did KUV or Eilat
have control over Dimassi?

 

A.      He is an
employee of Eilat, but my witnessed experienced [sic], he ha[d] control over
Eilat.

 

Q.      Did Dimassi
ever perform any acts on behalf of KUV or Eilat?

 

A.      I think he
acted on one incidence on behalf of KUV or Mr. Epstein, and he acted on behalf
of Eilat, yes, doing something.

 

Q.      Specifically
could you describe for the Court what instance you are referring with respect to?

 

A.      Okay.  If you
don’t get bored with the incident.  Back when the -- I started telling this story
before -- when the bankruptcy ordered the locks to be changed and secure the
building at 4421 South Freeway, the Judge ordered Fares Construction to pay for
changing the locks, and we were ordered to go to 4421 South Freeway.

 

We went there with
the representative of the trustee, Mr. Scott Sidel, with a gentleman named
Lupe, myself representing Fares Construction, and Moshe Epstein was to
represent KUV, and their attorney at the time, Irene Brush.

 

We get there, and I
called the locksmith, and Fares Construction paid for changing the locks and
giving the key to the trustee.  At that p[o]int, Mr. Dimassi was on the
premises painting that same wall I had painted to conform with Palomina’s. 
He's repainting the walls, and he came out chasing me in the parking lot until
the Court representative told him he need to step aside.  When we ask Mr.
Epstein why he is there, he said he’s representing him.

 

Q.      And what time
frame was this?

 

A.      This was
February 28, 2008 -- or 26th, 2008.  It's a Court order.

 

Subcontractors

Dale
Karickhoff, president of Skyline Electric, a subcontractor on the project,
testified that Dimassi and Epstein personally gave Skyline Electric employees
instructions on how they should do their work.  He understood that he would
install whatever Epstein told him to, wherever he told him to.  Epstein “gave
[Karickhoff] to understand that they [Epstein and Dimassi] were involved in the
ownership.”

Ayoub
Mehri, the HVAC contractor, testified that Dimassi told him what work to do and
was at the project “pretty much every day.”  Dimassi introduced Epstein to
Mehri one time as “one of the owners, or something like that.”

Mustafa
Dabbakeh, who did carpentry work for the project, testified that Dimassi was
“supposedly the owner of the place,” that Goran was his partner, and that
“everybody was interfering with how the work should be done.”  Dimassi and
Epstein both gave him instructions and ideas about the work for the project. From
his discussions with Dimassi and Epstein, it appeared that they had a joint
interest in getting the restaurant completed and opened.  According to Dabbakeh,
Epstein told him that he was the holder of the lease and “it was in his
interest that the place will be finished so he can collect his money on the
lease, because some rent wasn’t getting paid there to him.”

Clint
Nunley from Binswanger Glass testified that Fares was the only person who gave
him instructions at the work site.

Moshe Epstein

Moshe
Epstein testified that he and his wife operated Zorro’s and a catering
business, which is also owned by Eilat.  Dimassi had been the general manager
of Zorro’s since January or February 2008, and he earned a percentage of the
gross sales of the restaurant each month.  Zorro’s opened in June 2008.  At the
time of trial, Epstein was a member of KUV.  Epstein testified that KUV had signed
a lease as lessee for the South Freeway property.

Epstein
testified that he initially worked with a man named Javier who worked at
Palomina’s for Dimassi; Epstein and Hargrove eventually decided not to do
business with Javier.  They entered into a sublease with Dimassi instead.  Epstein
admitted to “observing” at the construction site on a weekly basis and also to
letting his credit card be charged two times for supplies.  But Epstein said he
did not give Karickhoff any instructions about what to do until after the
project was being converted to Zorro’s.  According to Epstein, Karickhoff told
him at that time that he could not work with him because if he did so, he would
not be able to work with Fares anymore.  Epstein also denied giving Mehri
instructions while at the site.  Epstein said he agreed to having the electric
bill put in his name because Fares approached him and said it had to be done
immediately; Epstein was simply “allow[ing] the work to continue.”  According
to Epstein, Dimassi paid his rent through Goran, which was as if Dimassi had
paid the rent himself.  Dimassi started defaulting on rent in November 2007.

Epstein
later admitted that there were times when he told the subcontractors that “I
would have done something like that, but not more than that.”  It was important
to him to get the business up and running so that he could make his profit. 
According to Epstein, in the beginning of the project he introduced Dimassi to
Goran and they came to some kind of business arrangement, with “the money . . .
between them.”  He did not know what was in the agreement and it was not his
problem.

Epstein
testified that if he and Fares were at the site together, they “talked about many
things, the same as talked [sic] with other people.”  He understood that Goran
was funding Dimassi for the construction, but he did not know how much.  Epstein
did not know Fares was going to abandon the project; when Epstein came back
from a trip to Israel in mid November 2007, there was no one at the site.  At
that point, Epstein decided to take over the project to try to earn back what
he and Hargrove had already invested.  Epstein discovered Dimassi was already
in personal and corporate bankruptcy but KUV mistakenly locked Dimassi out for
abandoning the project.

Eventually,
Epstein and his wife decided that Dimassi would be perfect to run the
restaurant they had envisioned to recoup their losses.  KUV eventually
purchased Dimassi’s sublease from the bankruptcy trustee for $11,000.  The
assignment of the sublease was subject to “any existing liens claims and
encumbrances, to the extent they exist as to the Sublease.”

Epstein
admitted attending a meeting in December 2007 at which Fares was present.  Fares
said at that meeting that it would take approximately $50,000 to finish the
restaurant.  He said that Hargrove considered having Fares finish the work, but
Epstein did not worry about it because he did not personally owe Fares any
money.

The
sublease to Eilat started June 2008; until then KUV financed all the work on
finishing the improvements to the premises.

Appellant
recalled Epstein to testify.  Epstein said he met Mondragon in the beginning of
2007.  Javier worked at Palomina’s in Arlington, and Epstein met him there. 
Javier said he wanted to get out of Palomina’s and open a restaurant with
Epstein and Hargrove as investors.  The two decided not to do business with
Mondragon because “things would change like a moving target,” but they did
decide to find a restaurant for him.  Epstein was looking for a place for
Mondragon to open a restaurant when he saw the South Freeway building.  He
talked with the owner, who offered to either rent or sell the restaurant; after
negotiating with Hargrove and Epstein, the owner agreed to lease terms.  After
the lease was signed, Mondragon backed out of signing a sublease.  At that
point, Epstein approached Dimassi, the owner of Palomina’s in Arlington.

Epstein and Dimassi talked for a few days and came to an
agreement on the same sublease terms Epstein and Hargrove had offered to
Mondragon.  Epstein denied having any discussions about entering into a joint
venture or partnership with Dimassi.  He also denied authorizing Dimassi to
take any actions on behalf of KUV.  According to Epstein, Dimassi paid a
security deposit for the sublease.

Epstein explained that he introduced Dimassi to Goran
when Dimassi approached him saying he needed money; Epstein and Goran did not
enter into a business relationship with respect to the building.[4] 
According to Epstein, Goran was never a representative of KUV, nor was he
authorized to take any action on KUV’s behalf.

Epstein
admitted being at the construction site frequently.  He claimed that he was
keeping an eye on Ngai’s equipment that was starting to disappear, that he
would stop by after visiting other properties of his and Hargrove’s in the
area, and that he would ask the subcontractors working at the leased premises to
work on his wife’s rental space in Arlington where she operated her catering
business. Epstein admitted saying from time to time that if the restaurant were
his, he would do the work in a certain way, but because it was not, he would
not dictate what to do.  Epstein admitted talking to two subcontractors on the
site, including the electrician.

KUV
did not know about the Palomina’s corporate bankruptcies because it was not a
creditor of Palomina’s, only Dimassi’s.  Epstein was not aware of Dimassi’s
personal bankruptcy filing until mid November 2007 when he returned from
Israel.  KUV attempted to terminate the sublease but could not because of the
pending bankruptcy proceeding; however, Epstein and Hargrove did start to look
for a replacement sublessee.

After
Hargrove paid the December rent payment, he told Epstein he could not do it
anymore and discussed abandoning the lease.  Epstein then proposed that his
wife open and operate a restaurant in the building.  They agreed to finish out
the restaurant and asked Dimassi to supervise the finish out and opening of the
restaurant.  Dimassi was paid out of the profits of the restaurant by Eilat,
not KUV.  According to Epstein, Dimassi had no authority to contract for KUV or
Eilat, was not an authorized signatory on any of Eilat’s or KUV’s bank
accounts, and did not participate in any of the bookkeeping or accounting.

Epstein
testified that after KUV purchased Dimassi’s sublease from the bankruptcy
trustee, it immediately terminated it.  However, KUV provided no evidence of
any written termination of the sublease.

The
only members of KUV are Epstein and Hargrove.  According to Epstein, KUV did
not ask Fares to do any work at the property, nor did Eilat do so.  Epstein
answered “No” when asked if there was any common ownership between KUV and DFW
AUCE or between Eilat and DFW AUCE.  He also testified that Dimassi had no
interest in KUV or Eilat and that Dimassi had no common employees with KUV or
Eilat, except when Dimassi was helping to get Zorro’s ready to open; however,
the workers during that time were temporary employees of KUV.  KUV had no
centralized accounting with Dimassi, nor did Dimassi pay any wages of employees
of KUV or Eilat.  There was no common business name, no agreement to share
profits or losses, no intent by anyone from KUV or Eilat to be Dimassi’s
partner, no right to participate in Dimassi’s proposed restaurant, and no
agreement by KUV, Hargrove, or Epstein to repay any of Dimassi’s debts.

On
cross-examination, Epstein admitted that the security deposit for KUV’s lease
was $20,000 and that Dimassi paid $15,000 to KUV that they used to pay part of
the security deposit to Ngai.  The $15,000 was Dimassi’s security deposit for
the sublease.  They received the $15,000 from Dimassi on the day he signed the
sublease; they received around $40,000 from Goran on Dimassi’s behalf after
that.  The money was solely for rents and deposits under the sublease.

Dimassi
was already in bankruptcy when Epstein agreed to put the electricity in his
name; he said he did so because Fares told him the work could not be completed
if Epstein did not do so.  He admitted to meeting with Fares in a Bennigan’s in
Arlington but said he listened to Fares’s problems with Dimassi and only “helped
or heard.”

David Goran

Goran
identified himself at trial as self-employed in real estate investment; he is
the 100% shareholder and sole officer of DFW AUCE.  Epstein approached Goran
about investing in Dimassi’s restaurant, and Goran decided to loan Dimassi
money for tenant improvements.  Goran agreed to loan Dimassi up to $150,000 in
installments as work was finished.  Goran disbursed funds by paying Fares
directly.  According to Goran, Epstein was not involved in loaning any money.

Goran
denied telling anyone that he owned two percent of the restaurant. But he did
say that when Dimassi began to have trouble paying the bills, he and Dimassi
had worked out that Goran would be entitled to a percentage of either net sales
or profits until Dimassi could pay him back.  They had these discussions in a
meeting with Alahmady, Dimassi, and Fares.  Goran denied being involved in “any
type of business transaction or relationship” with Epstein or Hargrove.  On
July 30, 2007, Goran wired money to Hargrove’s account, but Goran does not
remember what it was for or what Hargrove did with it.

Goran
estimated that he went to the construction site about three to four times a
month for three or four months.  He saw Epstein there.  He admitted signing a
note to Dimassi but he could not explain the details.  On cross-examination,
Goran said that he knew Fares continued to work on the project after learning
of Dimassi’s bankruptcy.  He denied ever being a partner of Dimassi’s or having
any commonality with KUV or Eilat.

Mac Hargrove

According to Hargrove, Dimassi defaulted in his rent in
either September or October 2007.  Two payments for Dimassi’s obligations under
the sublease came from Goran’s account.  One of the payments was for KUV’s
obligation as lessee for tax and insurance payments and for a portion of
Dimassi’s deposit.[5] 
Hargrove testified that he set up an account at Sterling Bank for the sublease
funds so that all payments KUV received from either Dimassi or Goran were
applied solely to rent, expenses, and deposits under the sublease.

Hargrove
testified that he was at a meeting with Epstein and Laurie Deltuva in December
2007 at the Palomina’s in Arlington when Fares happened to show up.  Epstein
and Hargrove began talking with Fares, and Hargrove asked how much it would
cost to finish the work; Fares responded, “$50,000,” and the two asked Fares to
complete the work for that price.  Hargrove denied paying any personal money
toward the finish out of the space.

Hargrove
testified that when the bankruptcy court entered the order approving of the
assignment of the sublease to KUV, Hargrove knew that Fares claimed a lien on
“some interest in the property.”

When
Hargrove learned that Dimassi was on the premises between February and May 2008
for the purpose of opening Zorro’s, he was concerned:

Two concerns.  Number
one is that I was very concerned about getting the rent paid; and number two,
was the fact that the restaurant seemed to be very delayed in the opening, and
I did not want this to go on indefinitely, and I was reassured that Mr. Dimassi
was an employee, that there was no connection between operation, which Mr.
Epstein had put together, and that he was -- totally be -- he would be totally
paid as an employee, and that there would be no involvement with Mr. Dimassi in
the new restaurant.

 

Epstein
resolved Hargrove’s fears by assuring Hargrove that Dimassi was only an employee
and there was “no involvement” with Dimassi in the new restaurant.  Hargrove
characterized himself as merely an investor, with Epstein in charge of how the
businesses were operated.

At
one point, Hargrove considered trying to get KUV out of the lease with Ngai, so
he “insisted to [Epstein] that something be done.”  Epstein, however, suggested
they try to work it out, which is how they got involved in starting Zorro’s in
the space.  Hargrove answered basically the same questions as Epstein:  that Dimassi
was never a member of KUV and that they had never entered into a joint venture
with Dimassi, never agreed to repay his debts, never agreed to give him any
interest in KUV, and never agreed to participate in Dimassi’s restaurant.

Upon
returning from Israel and learning that Dimassi was in bankruptcy, Hargrove
attempted to terminate Dimassi’s sublease and show the space to other
prospective tenants.  He discussed the possibility with KNW Group, but they “were
not willing to make the necessary investment.”  He explained the difference in
the rent Eilat was paying versus the original rent:  he had already lost so
much money on the Dimassi sublease that he was trying to make it up, and his
information showed a restaurant in that space could be very profitable. Upon
buying Dimassi’s sublease from the trustee, KUV terminated it immediately and
“began to work desperately on finding someone else.”

KUV
remained current on all but one of its payments to Ngai even though Dimassi was
in default under the sublease.

Ricki Epstein

Ricki
Epstein is Epstein’s wife and the president and one of the shareholders of
Eilat.  She participates in the daily management of the restaurant but
confirmed that Dimassi is the general manager.  Ricki said she met Dimassi when
her husband told her, “Mac is going to lose a lot of money, we need to see how
to help out and maybe take over the restaurant.”  When Ricki told Epstein she
did not have the experience to run a restaurant, he suggested Dimassi. According
to Ricki, she and Epstein were very concerned about Hargrove losing money and
wanted to help him any way they could.

Kaiss Alahmady

Kaiss
Alahmady testified that in October 2007, he approached Fares about trying to
buy the Palomina’s restaurants out of bankruptcy.  He and Fares formed KNW Group. 
Alahmady denied being approached by anyone on behalf of KUV to offer a sublease
on the property.  KNW Group bought the Palomina’s restaurants in Arlington and
Richardson and took ownership of them in January 2008.

On
cross-examination, Alahmady testified that he first heard about the South
Freeway restaurant in October 2007 when he was investigating purchasing the
other Palomina’s restaurants.  He visited the site and met Dimassi and Fares. 
The few times he was there, he found out about Dimassi’s money troubles; he
heard Dimassi “several times promising payment, promising that the Fort Worth
group will eventually pay Fares Construction.”  Alahmady said he knew Dimassi,
Epstein, Hargrove, and Goran and “[i]t appeared to [him] that they are working
as a partner or a working a joint venture with each party interested in a
specific area of the operation with one objective as to operate the restaurant
in Fort Worth.”  According to Alahmady,

Mr. Dimassi always
brought the subject [up] when he discussed Mr. Epstein and Mr. Goran and Mr.
Mac Hargrove, he was talking about them like partner.  He was talking about the
venture and trying to -- to put it as a joint venture, where he’s going to
operate, he’s going to be the vehicle for operation of that location as a
restaurant, that eventually Mr. Hargrove will cash in through some mortgage
arrangement, that Mr. Goran has invested some money in, and he’s looking for
two percent partnership equivalent from the revenue.

 

For
those reasons, Alahmady thought it was clear that they were all “operating
together for one objective of finishing the restaurant.”

Nabil Dimassi

Dimassi
testified that at the time of trial he was an employee of Texas Zorro’s,
employed by Eilat.  He was the general manager of the restaurant, and his compensation
was roughly four percent of net sales.  He had owned four companies, Dallas
Buffet, Inc., Richardson Buffet Dining, Inc., Sherman Buffet Dining, Inc., and
Valencia, but he filed bankruptcy proceedings for all of them in June 2007,
less than one month after signing the sublease with KUV.  He did not inform
Hargrove or Epstein of the filing.  Dimassi had not provided any financial
information to Hargrove or Epstein for the sublease; Mondragon did so when he
was discussing opening up his own restaurant.

According
to Dimassi, Fares never gave him an initial estimate of how much the work would
cost.  In addition, Dimassi testified that he instructed Fares to stop the work
several times but that Fares continued working for thirty to forty days despite
the instruction.

Dimassi’s
agreement with Goran was that in exchange for the money he was advancing for
the project, Goran would receive two percent of the net sales from the
restaurant until his investment was paid back.  During a one-day period in the
fall of 2007 when Dimassi’s bankruptcy was mistakenly dismissed, he had Goran
sign a $200,000 note to him as “part of a management agreement.” According to
Dimassi, if Goran “got to use somebody else or fire me, he’s going to have to
pay me $200,000 as a penalty.”  In other words, “it was an umbrella protection
for [him], and also for Mr. Fares.”

Dimassi
paid the $15,000 security deposit from the other Palomina’s companies.  Dimassi
was at the job site three to five times per week.  He estimated that Fares had
been paid a little over $100,000 for the work done.

On
cross-examination, Dimassi said that Mondragon had stolen the financials for
Palomina’s to give to Epstein and Hargrove and that Dimassi had subsequently
sued Mondragon.  Dimassi met Epstein when Epstein came into the restaurant
asking whether Dimassi could sell some wholesale food to Epstein’s wife for her
catering business.  At that time, they discussed Dimassi’s possibly entering
into the sublease.  Dimassi said he told Epstein of his financial difficulties
at that time, but Dimassi also said that he told Epstein he might be able to
open the restaurant through an investor.  Epstein later introduced Dimassi to
Goran.  They made an oral agreement for Goran to loan him $150,000 to be repaid
over a two-year period from the restaurant’s net sales.  He did not offer Goran
any interest in the restaurant.  He denied discussing a partnership with
Epstein, offering Epstein or Hargrove any interest in the restaurant, or having
any interest in KUV or Eilat.

Dimassi
was aware that Fares and Alahmady were interested in buying the Palomina’s
restaurants; he talked to them about it every day.  In fact, the “N” in KNW
Group stood for Nabil; he was to participate in the group, but he withdrew on
the advice of his bankruptcy attorney.  Consequently, when Dimassi ordered
Fares to stop work, Fares told him that KNW Group was going to get the
restaurant anyway, so he had to finish the work.  Dimassi’s conversations with
Alahmady and Fares took place between October 2007 and January 2008. Hargrove
offered the opportunity for KNW Group to take the sublease to Dimassi, who
presented it to Fares and Alahmady, but Alahmady rejected the idea. According
to Dimassi, Fares and Alahmady also approached Ngai to try to foreclose on the
KUV lease.

Dimassi
testified that he told Fares he had a sublease with KUV, but he never told him
he was in a partnership or joint venture with KUV.  According to Dimassi,
Epstein did not direct work at the site, but he came “wandering around the
property . . . giving [his] opinion to subcontractors or contractors and talk[ing]
to Mr. Fares or [Dimassi], and basically . . . stick[ing] his nose in things.” 
Dimassi said that Epstein offered suggestions to Dimassi all the time, but he
never countermanded any of Dimassi’s instructions.  He characterized the
suggestions as opinions, not instructions, and said Fares should not have
followed them.

Dimassi
denied having an ownership interest in KUV or Eilat, or having been a partner,
joint venturer, or representative of either.  Dimassi never paid the wages of
KUV or Eilat employees; they had no common centralized accounting, no common
business name, no employees render services on behalf of the other, no
undocumented transfers of funds other than rent money, and no allocation of profits
and losses with each other.  KUV and Eilat had no right to participate in the
restaurant and never contributed any capital to it.

Whether
Evidence Supports Joint Enterprise and Joint Venture

In the first issue, KUV contends that there is no
evidence to support a finding that it is vicariously liable for Dimassi’s
obligations to Fares under a joint enterprise or joint venture theory.[6]

The essential elements of joint enterprise or joint
venture are (1) an express or implied agreement among the members of the group,
(2) a common purpose to be carried out by the group, (3) a community of
pecuniary interest in that purpose, and (4) an equal voice in the direction of
the enterprise, which gives an equal right of control.  SSP Partners v.
Gladstrong Invs. (USA) Corp., 275 S.W.3d 444, 451 (Tex. 2009); Omega
Contracting, Inc. v. Torres, 191 S.W.3d 828, 850 (Tex. App.––Fort Worth
2006, no pet.) (op. on reh’g).  A common pecuniary interest is a monetary
interest among the members of the group and shared without special or
distinguishing characteristics.  Bell v. VSPI, Inc., 205 S.W.3d 706, 722
(Tex. App.––Fort Worth 2006, no pet.); see St. Joseph Hosp. v. Wolff, 94
S.W.3d 513, 528 (Tex. 2003).  However, the benefit must be more than just a
financial one “from the successful downstream marketing of the[] goods or
services.”  Wolff, 94 S.W.3d at 528.  For instance, a franchisor may
have a common pecuniary interest in the retail sales of its franchisees, but it
does not have a “community of pecuniary interest” because its financial benefit
is indirect whereas the franchisee’s is direct.  Id.

Here, there is no evidence of a community of pecuniary
interest among KUV, Goran, DFW AUCE, and Dimassi.[7]
 KUV was the sublessor, obligated under the lease with Ngai whether Dimassi
fulfilled his obligations under the sublease or not.  There is no evidence that
KUV had an interest in any of the proposed Palomina’s profits; it was only
entitled to the lease payments from Dimassi as the sublessee.  As appellant’s counsel
pointed out in his closing argument, Epstein’s involvement in the buildout of
the premises is not so surprising; landlords frequently have a representative
on site during the construction of improvements.  Moreover, Epstein and
Hargrove knew KUV would not receive its rent under the sublease unless and
until the restaurant opened.  Thus, evidence of Epstein’s direct involvement
with the construction of the improvements does not show such a direct benefit
as would constitute a community of pecuniary interest among KUV, Dimassi, and
DFW AUCE.  Accordingly, there is no evidence supporting the trial court’s
implied finding of such an interest and its conclusion that the parties were
involved in a joint venture.  We sustain the first issue.

Agency

KUV
additionally contends that there is no evidence supporting the judgment on the
theory that it breached a contract with Fares because there is no evidence to
support a finding that Dimassi was acting as an agent for KUV.

The
law does not presume agency.  Tex. Cityview Care Ctr., L.P. v. Fryer,
227 S.W.3d 345, 352 (Tex. App.––Fort Worth 2007, pet. dism’d [mand. dism’d]); Lifshutz
v. Lifshutz, 199 S.W.3d 9, 22 (Tex. App.––San Antonio 2006, pets. denied). 
The party alleging agency has the burden to prove its existence.  Tex.
Cityview Care Ctr., L.P., 227 S.W.3d at 352; Lifshutz, 199 S.W.3d at
22.  Absent actual or apparent authority, an agent cannot bind a principal.  Tex.
Cityview Care Ctr., L.P., 227 S.W.3d at 352; Lifshutz, 199 S.W.3d at
22.

Actual
authority includes both express and implied authority and usually denotes the
authority a principal (1) intentionally confers upon an agent, (2)
intentionally allows the agent to believe he possesses, or (3) by want of due
care allows the agent to believe he possesses.  Tex. Cityview Care Ctr.,
L.P., 227 S.W.3d at 352; 2616 S. Loop L.L.C. v. Health Source Home Care,
Inc., 201 S.W.3d 349, 356 (Tex. App.––Houston [14th Dist.] 2006, no pet.); Lifshutz,
199 S.W.3d at 22.  Actual authority is created through conduct of the principal
communicated to the agent.  Tex. Cityview Care Ctr., L.P., 227 S.W.3d at
352; Lifshutz, 199 S.W.3d at 22.

Apparent
authority arises through acts of participation, knowledge, or acquiescence by
the principal that clothe the agent with the indicia of apparent authority. Ins.
Co. of N. Am. v. Morris, 981 S.W.2d 667, 672 (Tex. 1998); Tex. Cityview
Care Ctr., L.P., 227 S.W.3d at 353.  Certain limitations apply in
determining whether apparent authority exists.  Tex. Cityview Care Ctr.,
L.P., 227 S.W.3d at 353; Lifshutz, 199 S.W.3d at 22.  First,
apparent authority is determined by looking to the acts of the principal and
ascertaining whether those acts would lead a reasonably prudent person using
diligence and discretion to suppose the agent had the authority to act on
behalf of the principal.  Tex. Cityview Care Ctr., L.P., 227 S.W.3d at
353; Lifshutz, 199 S.W.3d at 22.  Only the conduct of the principal may
be considered; representations made by the agent of his authority have no
effect.  Tex. Cityview Care Ctr., L.P., 227 S.W.3d at 353; Lifshutz,
199 S.W.3d at 22–23.  Second, the principal must either have affirmatively held
the agent out as possessing the authority, or the principal must have knowingly
and voluntarily permitted the agent to act in an unauthorized manner.  Tex.
Cityview Care Ctr., L.P., 227 S.W.3d at 353; Lifshutz, 199 S.W.3d at
23.  Finally, a party dealing with an agent must ascertain both the fact and
the scope of the agent’s authority, and if the party deals with the agent
without having made such a determination, she does so at her own risk.  Tex.
Cityview Care Ctr., L.P., 227 S.W.3d at 353; Lifshutz, 199 S.W.3d at
23.

Here,
there is no evidence of any assertions by Epstein or Hargrove that Dimassi was
KUV’s agent; in fact, Fares himself testified that he knew Epstein was Dimassi’s
landlord, but he just did not know the extent of Epstein’s involvement in the
project.  However, Fares also admitted that he initially contracted with
Dimassi, and Dimassi approved all the work before Fares started it.  This
evidence is not inconsistent with a sublessor/sublessee relationship between
KUV and Dimassi.  Moreover, to the extent that any of Fares’s or the
subcontractors’ testimony can be interpreted as representations by Dimassi
that KUV was something more than a landlord, those representations are not
sufficient to prove an agency relationship.  See Tex. Cityview Care Ctr.,
L.P., 227 S.W.3d at 353; Lifshutz, 199 S.W.3d at 22–23.  Accordingly,
we conclude and hold that there is no evidence to support a finding or
conclusion that Dimassi was acting as KUV’s agent in entering into the contract
with Fares and, thus, no evidence that KUV is vicariously liable for breach of
that contract.  We sustain the second issue.




 

Quantum
Meruit

In
the fourth issue, KUV contends that there is no evidence supporting a damage
award against it on a quantum meruit theory.

To recover in quantum meruit, a party must prove that (1)
he or she rendered valuable services or furnished materials, (2) for the person
sought to be charged, (3) the services or materials were accepted, used, and
enjoyed by the person sought to be charged, and (4) under such circumstances as
reasonably notified the person sought to be charged that the plaintiff in
performing such services or furnishing such materials was expecting to be paid
by the person sought to be charged.  Vortt Exploration Co. v. Chevron USA,
Inc., 787 S.W.2d 942, 944 (Tex. 1990); Residential Dynamics, LLC v.
Loveless, 186 S.W.3d 192, 199 (Tex. App.––Fort Worth 2006, no pet.).  In
addition, the evidence must show that the efforts were undertaken for the person
to be charged and not just that the efforts benefitted that person.  McFarland
v. Sanders, 932 S.W.2d 640, 643 (Tex. App.––Tyler 1996, no pet.).

The
party seeking to recover in quantum meruit must establish that the work done
was accepted by the party to be charged “under such circumstances as reasonably
notified the recipient that the plaintiff, in performing expected to be
paid by the recipient.”  Sanders v. Total Heat & Air, Inc., 248
S.W.3d 907, 917 (Tex. App.––Dallas 2008, no pet.) (emphasis added); see
Heldenfels Bros. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992). 
The evidence must show that this reasonable notification occurred at the time
the services were accepted.  Heldenfels Bros., 832 S.W.2d at 41; Myrex
Indus., Inc. v. Ortolon, 126 S.W.3d 548, 551 (Tex. App.––Houston [14th
Dist.] 2003, pet. denied).  Thus, here, the notice element should focus on what
KUV, not Fares, knew or should have known at the time that it accepted the
services if it indeed did.  See Heldenfels Bros., 832 S.W.2d at 41;Tricon
Tool & Supply, Inc. v. Thurmann, 226 S.W.3d 494, 504 (Tex.
App.––Houston [1st Dist.] 2006, pet. denied).

Here,
Fares was assured by Goran and Dimassi of payment, and Goran even said he would
sell cans to pay Fares back.  Although Epstein spoke of helping out Dimassi
because he was “choking,” there is no evidence that Epstein ever offered to pay
Fares directly for anything; the few times he paid for something, he
paid directly to the supplier and only for specific items.  Cf. Wohlfahrt
v. Holloway, 172 S.W.3d 630, 636–37 (Tex. App.—Houston [14th Dist.] 2005,
pets. denied), cert. denied, 549 U.S. 1052 (2006).  This situation is
similar to those in Heldenfels and Sanders.  In Heldenfels,
a subcontractor sought payment from the property owner, the City of Corpus
Christi, but the Supreme Court concluded that the subcontractor had no
reasonable expectation of payment from the City even though the City had
approved payment to the general contractor for items supplied by the
subcontractor.  832 S.W.2d at 40–41.  In Sanders, the Dallas Court of
Appeals held that an HVAC subcontractor had no reasonable expectation of
payment from a homeowner even though the homeowner had attended meetings “about
upgrades, prices, and extra work” and personally approved the invoiced work. 
248 S.W.3d at 917.

Here,
the evidence shows that when Fares was working on the project, everyone
expected either Dimassi or Goran, individually or through DFW AUCE, to pay for
the improvements Fares constructed.  All of the invoices admitted into evidence
are addressed to either Texas Palomina’s, Dimassi, or DFW AUCE.[8]
There is no evidence of any payment from KUV, Epstein, or Hargrove to Fares for
any purpose.  Thus, there is no evidence to support a finding or conclusion
that KUV had reasonable notification at the time the improvements were being
constructed that Fares expected payment from it and not Dimassi, Goran, or DFW
AUCE.

This
case is distinguishable from Angroson v. Indep. Commc’ns, Inc., 711
S.W.2d 268 (Tex. App.––Dallas 1986, writ ref’d n.r.e.).  In that case, a tenant
contracted directly with a contractor to make improvements to leased premises,
and the work was started and completed for the tenant before the tenant
entered into a sublease.  Id. at 270.  The tenant and sublessor paid $25,000
to the contractor but then refused to pay any more.  Id.  In addition,
the tenant and sublessee corporations were owned by the same sole shareholder. 
Id.  Accordingly, that case is inapposite.

We
conclude and hold that there is no evidence to support a finding or conclusion
that Fares reasonably notified KUV that he expected payment from it for the
improvements to the leased premises.  Accordingly, there is no evidence
supporting an award of damages based on quantum meruit.  We sustain the fourth
issue.

Foreclosure
of Materialman’s Lien

In
the third issue, appellants contend that the trial court erred by finding or
concluding that Fares perfected a materialman’s lien on KUV’s leasehold
interest and by awarding Fares foreclosure of that lien.  In the fifth issue, appellants
contend that the lien on Dimassi’s subleasehold is no longer valid because they
purchased the sublease and terminated it.

To
have a valid materialman’s lien, the owner of the land affected must be a party
to the contract creating the lien.  2811 Assocs., Ltd. v. Metroplex Lighting
& Elec., 765 S.W.2d 851, 853 (Tex. App.––Dallas 1989, writ denied); Inman
v. Orndorff, 596 S.W.2d 236, 238 (Tex. Civ. App.––Houston [1st Dist.] 1980,
no writ).  A lien on real property cannot be established merely by virtue of a
contract between a lessee of the property and the materialman.  2811 Assocs.,
765 S.W.2d at 853.  “If a lessee contracts for construction, the mechanic’s
lien attaches only to the leasehold interest, not to the fee interest of the
lessor.”  Id. (quoting Diversified Mortg. Investors v. Lloyd D.
Blaylock Gen. Contractor, Inc., 576 S.W.2d 794, 805 (Tex.1978)); see
also Grube v. Nick’s No. 2, 278 S.W.2d 252, 253–54 (Tex. App.––El Paso
1955, writ ref’d n.r.e.).  “A mechanic’s lien may be foreclosed only on
judgment of a court of competent jurisdiction foreclosing the lien and ordering
the sale of the property subject to the lien.”  Tex. Prop. Code Ann. § 53.154
(Vernon 2007); CVN Group, Inc. v. Delgado, 95 S.W.3d 234, 239 (Tex.
2002).

KUV
does not challenge the trial court’s conclusion that Fares’s materialman’s lien
attached to Dimassi’s subleasehold; Dimassi directly contracted with
Fares to do the work that was completed.  See MG Bldg. Materials, Ltd. v.
Moses Lopez Custom Homes, Inc., 179 S.W.3d 51, 57 (Tex. App.––San Antonio
2005, pet. denied) (setting forth elements required to establish valid
mechanic’s and materialman’s lien).  Pursuant to the bankruptcy court’s
approval, the trustee assigned Dimassi’s sublease to KUV, subject to all liens
and encumbrances that had attached.  Thus, upon that assignment, KUV stood in
Dimassi’s place as the sublessee.  See State v. Oakley, 181
S.W.3d 855, 860 (Tex. App.––Austin 2005), rev’d in part on other grounds,
227 S.W.3d 58 (Tex. 2007).  Accordingly, unless KUV’s leasehold merged with the
assigned subleasehold, the only estate to which Fares’s lien could have
attached is KUV’s subleasehold interest, not its leasehold interest.

Merger
of estates is the absorption of a lesser estate in land into the greater;
however, application of this doctrine is disfavored in Texas.  Steger v.
Muenster Drilling Co., 134 S.W.3d 359, 376 (Tex. App.––Fort Worth 2003, pet.
denied).  For merger to occur, the following elements must be present:  (1)
there must be a greater and lesser estate; (2) both estates must unite in the
same owner; (3) both estates must be owned in the same right; (4) there must
not be an intervening estate; (5) merger must not be contrary to the intention
of the owner of the two estates; and (6) merger must not be disadvantageous to
the owner of the two estates.  Id.

The
issue of whether a merger of estates was intended is ordinarily a question of
fact that is determined by considering the estate owner’s interest and all
attending circumstances.  Id.  Equity will not, however, decree a merger
of estates when it would be disadvantageous to the person acquiring both
interests.  Id.  Thus, if, “from all the circumstances, a merger would
be disastrous to the party holding both estates, then his intention that it should
not result will be presumed.”  Id. at 376–77.  Further, when the
evidence shows that it was in the interest of the owner of the estates that
they remain separate, the law presumes an intent corresponding with such an
interest.  Id. at 377.

KUV
contends that it attempted to terminate Dimassi’s sublease after purchasing
it.  In addition, it subsequently re-subleased the premises to Eilat under
similar terms as Dimassi’s sublease.  Moreover, there is no evidence that KUV
acted as if it owned both a lease and a sublease on the premises or that
Eilat was a second sublessee.  Thus, the evidence shows an intent by KUV that
the two estates be merged.  See Franz v. Katy ISD, 35 S.W.3d 749, 754
(Tex. App.––Houston [1st Dist.] 2000, no pet.).  Because Fares had already
perfected his lien against the Dimassi sublease when KUV bought it expressly
subject to all liens and encumbrances, that lien became attached to KUV’s
leasehold interest when the lease and sublease merged.  See id. at
754–55.  Although the attachment of that lien does work somewhat of a
disadvantage to KUV, KUV nevertheless benefitted from the dissolution of the
Dimassi sublease and the subsequent ability to re-sublease the premises to
Eilat, thus ensuring a new revenue stream for payment of its rental under the
lease with Ngai.  See id. at 755.[9] 
Therefore, the trial court did not err by awarding foreclosure of the
materialman’s lien against KUV’s leasehold interest.

But
the trial court did err by ordering foreclosure on Eilat’s subleasehold
interest.  Although Eilat’s sublease is subordinate to KUV’s leasehold, that
sublease was executed after the perfection and attachment of the materialman’s
lien to KUV’s leasehold interest, and the foreclosure of that lien will
terminate Eilat’s sublease so that there will not be any sublease interest to
further foreclose upon.  See Aspenwood Apt. Corp. v. Coinmach, Inc., No.
01-08-00636-CV, 2011 WL 478546, at *5 (Tex. App.––Houston [1st Dist.] Feb. 10,
2011, no pet.) (holding that foreclosure of greater estate terminates lease but
subject to purchaser and lessee entering into new, independent lease
agreement); ICM Mortg. Corp. v. Jacob, 902 S.W.2d 527, 530 (Tex. App.––El
Paso 1994, writ denied).[10]

We
overrule the fifth issue as to KUV and Eilat and the third issue as to KUV.  But
we sustain the third issue as to Eilat.

Propriety
of Damage Award Against Eilat

In
the sixth issue, Eilat challenges the trial court’s damage award against it as
improper because (a) Fares never pled a claim for damages against Eilat, (b)
there is no evidence Eilat has any liability to Fares, and (c) there are no
express or implied findings supporting a damage award against it.

Fares
did not include a claim for damages against Eilat in his pleadings.  In fact,
during closing argument, his counsel told the trial court that Fares was not
claiming that Eilat had any personal liability to Fares but that Eilat was
merely the party with the right to possession of the premises for purposes of
foreclosing the lien.  Nothing in the record indicates that any claim for
damages against Eilat was tried by consent.  See Herrington v. Sandcastle
Condo. Ass’n, 222 S.W.3d 99, 102–03 (Tex. App.––Houston [14th Dist.] 2006, no
pet.).  Moreover, there are no findings or conclusions that support a damage
award against Eilat.  Accordingly, there is no basis on which to uphold the
inclusion of Eilat in the list of parties jointly and severally liable to Fares
for damages.  See Tex. R. Civ. P. 301; Bayou Terrace Inv. Corp. v.
Lyles, 881 S.W.2d 810, 817 (Tex. App.––Houston [1st Dist.] 1994, no writ)
(op. on reh’g); Dalon v. City of DeSoto, 852 S.W.2d 530, 537 (Tex.
App.––Dallas 1992, writ denied).  We sustain the sixth issue.

Conclusion

Having
sustained KUV’s first, second, and fourth issues challenging the theories of
vicarious liability pled and urged by Fares at trial, we reverse that part of
the trial court’s judgment ordering KUV to pay damages to Fares.[11] 
In addition, having sustained Eilat’s sixth issue challenging the award of
damages to Fares, we reverse that part of the trial court’s judgment ordering
Eilat to pay damages to Fares.[12] 
Having sustained the third issue as to Eilat, we also modify the judgment to
delete the part ordering foreclosure of Eilat’s sublease interest in the leased
premises.  See Tex. R. App. P. 43.2(b).

We affirm
the part of the judgment ordering foreclosure of Fares’s materialman’s lien
against KUV’s leasehold interest.  However, because of our disposition of the
first, second, fourth, and sixth issues, we must also remand the case to the
trial court for a new determination of attorney’s fees.  See Tex. Prop.
Code Ann. § 53.156 (Vernon 2007); Tony Gullo Motors I, L.P. v. Chapa,
212 S.W.3d 299, 313–14 (Tex. 2006).

 

 

                                                                             TERRIE
LIVINGSTON

                                                                             CHIEF
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

 

DELIVERED: 
March 17, 2011









[1]See
Tex. R. App. P. 47.4.





[2]The
initial filing with the Texas Secretary of State showed the name as KUB
Partners, LLC; the name was subsequently changed to KUV Partners, LLC, and they
are the same company.





[3]Unbeknownst
to all, the other Texas Palomina’s restaurants had been the subject of a
corporate bankruptcy since that summer.





[4]They
later became partners in an organic farming business.





[5]According to
Hargrove, based on his extensive experience in Texas real estate, there is no
statute or regulation requiring KUV to keep the security deposit money received
from Dimassi in a separate bank account.





[6]Fares
does not argue that there is evidence supporting the trial court’s judgment on
grounds of partnership, alter ego, or single business enterprise, nor have we
found any such evidence in our review of the record.  See Tex. Bus.
Orgs. Code Ann. § 152.052 (Vernon Supp. 2010); Ingram v. Deere, 288
S.W.3d 886, 894–904 (Tex. 2009); SSP Partners v. Gladstrong Invs. (USA) Corp.,
275 S.W.3d 444, 454, 456 (Tex. 2009).





[7]Fares
contends that KUV failed to challenge this implied finding, but in its brief,
KUV states that it is challenging any findings pertaining to joint
venture. Accordingly, we hold that the complaint is preserved.  See Tex.
R. Civ. P. 299; Tex. R. App. P. 38.1(f).





[8]Fares
contended at argument that because the invoices had the property address on
them, he reasonably notified KUV of his expectation of payment from “the
project.”  But none of the invoices were addressed specifically to Epstein,
Hargrove, or KUV, and Fares admitted that he hand delivered the invoices to
Dimassi at the work site, not to Epstein or Hargrove.





[9]In
its motion for rehearing, KUV contends that it could not have intended that the
two estates merge because the disadvantage of having its leasehold encumbered
by the mechanics’ lien greatly outweighs the income stream from the sublease to
Eilat.  But the question is whether the merger of the lease and sublease would
disadvantage KUV, not whether its leasehold being subject to the mechanics’
lien would disadvantage it.  Because KUV bought the sublease subject to the
lien, even if the two estates did not merge, KUV’s subleasehold interest would
still be encumbered by the lien.  KUV’s ineffective attempt to extinguish the
lien by terminating the sublease therefore does not show that KUV would be
disadvantaged by application of the doctrine of merger or that it never
intended for the two estates to merge.





[10]Both
the lease to KUV and the sublease to Eilat provide that all alterations,
improvements, and fixtures to the leased premises remain with the premises upon
termination of the lease or sublease unless required to be removed by the owner
of the premises.  Thus, the purchaser of KUV’s leasehold at any foreclosure
sale will obtain KUV’s entire interest in the leasehold but will not be able to
remove any alterations, fixtures, or improvements––whether installed by Fares
or any subsequent contractor––without KNW Group’s consent.  Neither will Eilat
be able to remove anything other than movable personal property that is not
affixed to the premises.  Moreover, even if there were a need to distinguish between
work performed by Fares and any subsequent contractor, Fares introduced
invoices detailing the type of work performed at the premises.





[11]Because
the seventh issue pertains only to the amount Fares claimed he was vicariously
owed from KUV, we need not address it.  See Tex. R. App. P. 47.1; Horsley-Layman
v. Adventist Health Sys./Sunbelt, Inc., 221 S.W.3d 802, 809 (Tex.
App.––Fort Worth 2007, pet. denied).





[12]Because
DFW AUCE did not appeal, we do not disturb the trial court’s damage award as to
DFW AUCE.